114 T.C. No. 26


UNITED STATES TAX COURT


ELDON R. KENSETH AND SUSAN M. KENSETH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2385-98.                          Filed May 24, 2000.


        In 1993, P recovered a $229,501 settlement under
the Federal Age Discrimination in Employment Act of
1967, Pub. L. 90-202, sec. 2, 81 Stat. 602, current
version at 29 U.S.C. secs. 621-633a (1994). A portion
of the settlement proceeds was deposited in the trust
account of P's attorney, X. In distributing the
settlement proceeds, X retained $91,800 in attorney's
fees pursuant to a contingent fee agreement. The
remaining amount was paid to P. P excluded the
settlement proceeds designated as personal injury
damages under the settlement agreement. R determined
that the entire $229,501 recovered was includable in
gross income but allowed the attorney's fees paid as a
miscellaneous itemized deduction. P concedes that the
settlement proceeds are not excludable in their
entirety but contends that the amount allocable to
attorney's fees should be excluded from gross income.
        <u>Held</u>, the amount retained by X for attorney's fees
is includable in P's gross income for 1993 under the
assignment of income doctrine. This Court respectfully

declines to follow the reasoning of the Federal Courts of Appeals in <u>Estate of Clarks v. United States</u>, 202 F.3d 854 (6th Cir. 2000), and <u>Cotnam v. Commissioner</u>, 263 F.2d 119 (5th Cir. 1959), revg. in part and affg. in part 28 T.C. 947 (1957).

<u>Cheryl R. Frank</u>, <u>Chaya Kundra</u>, and <u>Gerald W. Kelly, Jr.</u>, for petitioners.

<u>George W. Bezold</u>, for respondent.

RUWE, <u>Judge</u>:[*]  Respondent determined a deficiency of $55,037 in petitioners' 1993 Federal income tax.  The sole issue for decision is whether petitioners' gross income includes the portion of the settlement proceeds of a Federal age discrimination claim that was paid as the attorney's fees of Eldon R. Kenseth (petitioner) pursuant to a contingent fee agreement.

                          FINDINGS OF FACT

The parties have stipulated some of the facts, and the stipulations of facts and the attached exhibits are incorporated in this opinion.  At the time of filing their petition, petitioners resided in Cambridge, Wisconsin.

In a complaint filed with the Wisconsin Department of Industry, Labor, and Human Relations (DILHR) in October 1991, petitioner alleged that on March 27, 1991, APV Crepaco, Inc.

---

[*]This case was reassigned to Judge Robert P. Ruwe by order of the Chief Judge.

(APV), terminated his employment. The complaint also alleged that, at the time of his discharge, petitioner was 45 years old, held the position of master scheduler, was earning $33,480 per year, and had been employed by APV for 21 years. It further alleged that, around the time of petitioner's discharge, APV did not terminate younger employees also acting as master schedulers but did terminate other employees over age 40.

Prior to filing the DILHR complaint, petitioner and 16 other former employees of APV (the class) retained the law firm of Fox & Fox, S.C. (Fox & Fox), to seek redress against APV. In July 1991, petitioner executed a contingent fee agreement with Fox & Fox that provided for legal representation in his case against APV. Each member of the class entered into an identical contingent fee agreement with Fox & Fox.

The contingent fee agreement was a form contract prepared and routinely used by Fox & Fox; the client's name was manually typed in, but the names of Fox & Fox and APV had already been included in preparing the form used for all the class members. Fox & Fox would have declined to represent petitioner if he had not entered into the contingent fee agreement and agreed to the attorney's lien provided therein.

The contingent fee agreement provided in relevant part:[1]

---

[1] The portions of the Agreement not quoted are secs. "I. INTRODUCTION", "IV.  THE ATTORNEYS' FEES WHERE THERE IS A SEPARATE PAYMENT OF ATTORNEYS' FEES", and "V.  EXPLANATION OF FEE
(continued...)

FOX & FOX, S.C.

CONTINGENT FEE AGREEMENT:  (Case involving Statutory Fees)

\*      \*      \*      \*      \*      \*      \*

II.  CLIENT TO PAY LITIGATION EXPENSES

The client will pay all expenses incurred in connection with the case, including charges for transcripts, witness fees, mileage, service of process, filing fees, long distance telephone calls, reproduction costs, investigation fees, expert witness fees and all other expenses and out-of-pocket disbursements for these expenses according to the billing policies and procedures of FOX & FOX, S.C.  The client agrees to make payments against these bills in accordance with the firm's billing policies.

III.  THE ATTORNEYS' FEES WHERE THERE IS NO SEPARATE PAYMENT OF ATTORNEYS' FEES

In the event that there is recovered in the case a single sum of money or property including a job that can be valued in monetary advantage to the client, either by settlement or by litigation, the attorneys' fees shall be the greater of:

A.    A reasonable attorney's fee in a contingent case, which shall be defined as the attorneys' fees computed at their regular hourly rates, plus accrued interest at their regular rate, plus a risk enhancer of 100% of the regular hourly rates (but in no event greater than the total recovery), or:

B.    A contingency fee, which shall be defined as:

---

[1](...continued)
CONCEPTS".  Sec. V sets forth a justification for the provisions of the agreement that is couched in terms of obviating the potential for conflicts of interest between the attorneys and the client by creating an identity of economic interests of attorneys and client in the prosecution of the claim.

Forty percent (40%) of the recovery if it is recovered before any appeal is taken;

Forty-Six percent (46%) of the recovery if it is recovered after an appeal is taken.

Any settlement offer of a fixed sum which includes a division proposed by the offeror between damages and attorneys' fees shall be treated by the client and the attorneys as an offer of a single sum of money and, if accepted, shall be treated as the recovery of a single sum of money to be apportioned between the client and the attorneys according to this section. Any division of such an offer into damages and attorneys' fees shall be completely disregarded by the client and the attorneys.

\*     \*     \*     \*     \*     \*     \*

## VI.   CLIENT NOT TO SETTLE WITHOUT ATTORNEYS' CONSENT

The client will not compromise or settle the case without the written consent of the attorneys. The client agrees not to waive the right to attorneys' fees as part of a settlement unless the client has reached an agreement with the attorney for an alternative method of payment that would compensate the attorneys in accordance with Section III of this agreement.

## VII.   WIN OR LOSE RETAINER

The client agrees to pay a Five Hundred ($500.00) Dollar win or lose retainer. This amount will be credited to the attorney fees set forth in Section III in the event a recovery is made. If no recovery is made, this amount is non-refundable to the client.

## VIII.   LIEN

The client agrees that the attorney shall have a lien against any damages, proceeds, costs and fees recovered in the client's action for the fees and costs due the attorney under this agreement and said lien shall be satisfied before or concurrent with the dispersal of any such proceeds and fees.

IX.  CHANGE OF ATTORNEY

In the event the client chooses to terminate the contract for legal services with Fox & Fox, S.C., said firm will have a lien upon any recovery eventually obtained.  Said lien will be for the fees set forth in Section III of this agreement.

In the event the client chooses to terminate the contract for legal services with Fox & Fox, S.C., the client will further make immediate payment of all outstanding costs and disbursements to the firm of Fox & Fox, S.C. and will do so within ten (10) days of the termination of the contract.

In entering into this contract Fox & Fox, S.C. has relied on the factual representations made to the firm by the client.  In the event such representations are intentionally false, Fox & Fox, S.C. reserves the right to unilaterally terminate this agreement and to charge the client for services to the date of termination rendered on an hourly basis plus all costs dispersed and said amount shall be due within ten (10) days of termination.

At the time of entering into the contingent fee agreement, petitioner had paid only the $500 "win or lose" retainer to Fox & Fox.  This amount was to be credited against the contingent fee that would be payable if there should be a recovery on the claim; if there should be no recovery, this amount was nonrefundable.  Under section II of the agreement, petitioner expressly agreed to reimburse Fox & Fox for out-of-pocket expenses, in accordance with the firm's normal billing policies and procedures.  In contrast, under section III of the agreement (which set forth the contingent fee agreement), petitioner did not expressly agree to pay anything.  Instead, section III provided how the amount of the contingent fee was to be

calculated if there should be a recovery.  Other sections of the agreement summarized below provided for the attorney's lien.

The contingent fee agreement required aggregation of the elements of any settlement offer divided between damages and attorney's fees and provided that any division of such an offer into damages and attorney's fees would be disregarded by Fox & Fox and petitioner.  The contingent fee agreement provided that petitioner could not settle his case against APV without the consent of Fox & Fox.  Under the contingent fee agreement, petitioner agreed that Fox & Fox "shall have a lien" for its fees and costs against any recovery in petitioner's action against APV.  This lien by its terms was to be satisfied before or concurrently with the disbursement of the recovery.  The contingent fee agreement further provided that, if petitioner should terminate his representation by Fox & Fox, the firm would have a lien for the fees set forth in section III of the agreement, and all costs and disbursements that had been expended by Fox & Fox would become due and payable by petitioner within 10 days of his termination of his representation by Fox & Fox.

APV had proposed that petitioner and the other members of the class sign separation agreements in return for some severance pay.  Fox & Fox advised the class members that the form of separation agreement used by APV did not comply with the Older Workers Benefits Protection Act of 1990, Pub. L. 101-433, 104

Stat. 978.  As a result, petitioner and the class members who signed the separation agreements and received severance pay were able to file administrative discrimination complaints and bring suit against APV, notwithstanding any purported release of their claims against APV in the separation agreements.

On October 16, 1991, petitioner filed an administrative complaint, using documents prepared by Fox & Fox, setting forth the basis of his age discrimination claim against APV, with DILHR.  Around March 1992, DILHR sent a copy of petitioner's complaint to the U.S. Equal Employment Opportunity Commission (EEOC).  The initiation of these administrative discrimination claims was a condition precedent to bringing suit against APV under the Federal Age Discrimination in Employment Act of 1967 (ADEA), Pub. L. 90-202, sec. 2, 81 Stat. 602, current version at 29 U.S.C. secs. 621-633a (1994).

On June 16, 1992, Fox & Fox filed a complaint on behalf of petitioner and the other class members against APV in the U.S. District Court for the Western District of Wisconsin.  The complaint alleged a deprivation of their rights under ADEA and sought back wages, liquidated damages, reinstatement or front pay in lieu of reinstatement, and attorney's fees and costs, and demanded a trial by jury.

EEOC had initially recommended that the members of the class settle their age discrimination suit for less than $1 million in

the aggregate.  The total settlement that Fox & Fox negotiated on behalf of the claimants amounted to $2,650,000, which was apportioned as follows pursuant to the contingent fee agreements:

| | |
|---|---|
| Total recovery to class members | $1,590,000 |
| Total fee to Fox & Fox | 1,060,000 |
| Total settlement | 2,650,000 |

On February 15, 1993, the dispute between petitioner and APV was resolved by their execution of a "Settlement Agreement and Full and Final Release of Claims" (settlement agreement).  Each member of the class entered into an identical settlement agreement.  The entire amount received by the members of the class under their settlement agreements represented a recovery under ADEA.  However, the settlement agreements required petitioner and the other members of the class to relinquish all their claims against APV, including claims for attorney's fees and expenses but did not specifically allocate any amount of the recovery to attorney's fees.  The settlement agreement required petitioner to cause the administrative actions pending before EEOC and DILHR to be dismissed with prejudice.  The settlement agreement provided that it was to be "interpreted, enforced and governed by and under the laws of the State of Wisconsin".

Petitioner's allocated share of the gross settlement amount of $2,650,000 was $229,501.37.  Of this amount, $32,476.61 was paid as lost wages by an APV check issued directly to petitioner. APV withheld applicable Federal and State employment taxes from

this portion of the settlement; the actual net amount of the check to the order of petitioner was $21,246.20.

The portion of the settlement proceeds allocated to petitioner and not designated as lost wages was $197,024.76, which the settlement agreement characterized "as and for personal injury damages which the parties intend as those types of damages excludable from income under section 104(a)(2) of the Internal Revenue Code as damages for personal injuries and the corresponding provisions of the Tax Code of the State of Wisconsin." APV issued a check for this amount directly to the Fox & Fox trust account. Fox & Fox calculated its fee, pursuant to the contingent fee agreement, using 40 percent of the gross settlement amount of $229,501.37 allocated to petitioner. After deducting its fee of $91,800.54 and crediting petitioner with the $500 "win or lose" retainer payment, Fox & Fox issued a check for $105,724.22 from the Fox & Fox trust account to petitioner.

With the check that was received from Fox & Fox, petitioner and every other class member received a settlement statement, prepared by Fox & Fox, setting forth the recipient's share of the total settlement, the legal fee after credit for the retainer, the net proceeds to the recipient, and the portion from which taxes would be "deducted". The recipient signed the settlement statement, accepting and approving "the distribution of the proceeds as set forth on this statement." The recipient also

acknowledged in the settlement statement that a portion of the settlement proceeds had been characterized as personal injury damages not subject to tax, but that this characterization was not binding on taxing authorities, and agreed to pay any taxes that might become due on the proceeds.

The settlement agreement provided that APV would be held harmless for any taxes (other than on the amount allocated to lost wages) "imposed on the amounts dispersed under this agreement".

On their 1993 income tax return, petitioners reported as income only that portion of the settlement proceeds that was allocated to wages--$32,476.61. They did not report or disclose all or any part of the $197,024.76 that was allocated to personal injury damages, nor did they claim or otherwise report a deduction for all or any part of the attorney's fees.

The notice of deficiency that was issued to petitioners made an adjustment to their 1993 income to increase gross income in respect of the settlement of petitioner's ADEA claims by $197,024 (from $32,477 to $229,501). The notice also allowed $91,800 in legal fees as an itemized deduction, reduced by $5,298 for the 2-percent floor on miscellaneous itemized deductions under section 67[2] and by $4,694 for the overall limitation on itemized

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and

(continued...)

deductions under section 68. The deficiency of $55,037 that was determined by respondent included a liability of $17,198 for alternative minimum tax arising from the disallowance of the miscellaneous itemized deduction of the attorney's fees for the purpose of the alternative minimum tax under section 56(b)(1)(A)(i).

Petitioner and the other members of the class relied on the guidance and expertise of Fox & Fox in signing the separation agreements tendered to them by APV and then seeking redress against APV. Commencing with the advice to petitioner that he could sign the separation agreement with APV without giving up his age discrimination claim, Fox & Fox made all strategic and tactical decisions in the management and pursuit of the age discrimination claims of petitioner and the other class members against APV that led to the settlement agreement and the recovery from APV.

Fox & Fox was aware of the relationship between any gross settlement amount and the resulting fee that Fox & Fox would receive. In the effort to ensure that the amounts ultimately received by petitioner and the other class members would approximate the full value of their claims, Fox & Fox factored in an amount for the attorney's fee portion of the settlement in

[2](...continued)
Procedure.

preparing for and conducting their negotiations with APV and its attorney

Petitioner's complaint filed with DILHR, his civil complaint with the District Court for the Western District of Wisconsin, and the settlement agreement were signed by Michael R. Fox or Mary E. Kennelly of Fox & Fox. Fox & Fox's office is in Madison, Wisconsin; Mr. Fox and Ms. Kennelly are admitted to practice law in Wisconsin.

## OPINION

Petitioners concede that the proceeds from the settlement are includable in gross income except for the portion of the settlement used to pay Fox & Fox under the contingent fee agreement. Specifically, petitioners argue that they exercised insufficient control over the settlement proceeds used to pay Fox & Fox and should, therefore, not be taxed on amounts to which they had no "legal" right and could not, and did not, receive. Conversely, respondent argues that (1) the amount petitioners paid or incurred as attorney's fees must be included in petitioners' gross income and (2) the contingent fee is deductible as a miscellaneous itemized deduction, subject to the 2-percent floor under section 67 and the overall limitation under section 68 and also nondeductible in computing the alternative minimum tax (AMT) under section 56.

This controversy is driven by the substantial difference in the amount of tax burden that may result from the parties' approaches.[3] The difference, of course, is a consequence of the plain language of sections 56, 67, and 68, so the characterization of the attorney's fees as excludable or deductible becomes critical. There have been attempts to provide relief from the resulting tax burden by creative approaches, including attempts to modify long-standing tax principles. This Court believes that it is Congress' imposition of the AMT and limitations on personal itemized deductions that cause the tax burden here. We perceive dangers in the ad hoc modification of established tax law principles or doctrines to counteract hardship in specific cases, and, accordingly, we have not acquiesced in such approaches. See Alexander v. IRS, 72 F.3d 938, 946 (1st Cir. 1995) (stating that the effect of the AMT on

---

[3] Under respondent's position in this case, the settlement proceeds are included in petitioners' gross income in full, but the itemized deduction is subject to limitations and is not available in computing the alternative minimum tax (AMT). Under these circumstances, it is possible that the attorney's fees and tax burden could consume a substantial portion (possibly all) of the damages received by a taxpayer. It is noted, however, that if the recovery or income was received in a trade or business setting, the attorney's fees may be fully deductible in arriving at adjusted gross income, thereby obviating the perceived unfairness that may be occasioned in the circumstances we consider in this case. Commentators and courts have long observed this potential for unfairness in the operation of the AMT in this and other areas of adjustments and tax preference items. See, e.g., "State Bar of California Tax Section, Partial Deduction of Attorneys' Fees Proposed for Computing AMT", 1999 TNT 125-45 (June 30, 1999); Wood, "The Plight of the Plaintiff: The Tax Treatment of Legal Fees", 98 TNT 220-101 (Nov. 16, 1998).

an individual taxpayer's deduction of legal expenses "smacks of injustice" because the taxpayer is effectively robbed of any benefit from the deductibility of legal expenses as miscellaneous itemized deductions), affg. T.C. Memo. 1995-51.  Despite this potential for unfairness, however, these policy issues are in the province of Congress, and we are not authorized to rewrite the statute.  See, e.g., <u>Badaracco v. Commissioner</u>, 464 U.S. 386, 398 (1984); <u>Warfield v. Commissioner</u>, 84 T.C. 179, 183 (1985).

There is a split of authority among the Federal Courts of Appeals on this issue.  The U.S. Court of Appeals for the Fifth Circuit reversed this Court and held that amounts awarded in Alabama litigation that were assigned and paid directly to cover attorney's fees pursuant to a contingent fee agreement are excludable from gross income.  See <u>Cotnam v. Commissioner</u>, 263 F.2d 119 (5th Cir. 1959), affg. in part and revg. in part 28 T.C. 947 (1957).  In <u>Cotnam</u>, the taxpayer entered into a contingent fee agreement to pay her attorney 40 percent of any amount recovered on a claim prosecuted for the taxpayer's behalf. A judgment was obtained on the claim, and a check in the amount of the judgment was made jointly payable to the taxpayer and her attorney.  The attorney retained his share of the proceeds and remitted the balance to the taxpayer.  The Commissioner treated the total amount of the judgment as includable in the taxpayer's gross income and allowed the attorney's fees as an itemized

deduction.  This Court agreed with the Commissioner, holding that the taxpayer realized income in the full amount of the judgment, even though the attorney received 40 percent in accordance with the contingent fee agreement.

The U.S. Court of Appeals for the Fifth Circuit's reversal was based on two legal grounds.  An opinion by Judge Wisdom on behalf of the panel reasoned that, under the Alabama attorney lien statute, an attorney has an equitable assignment or lien enabling the attorney to hold an equity interest in the cause of action to the extent of the contracted for fee.  See id. at 125. Under the Alabama statute, attorneys had the same right to enforce their lien as clients have or had for the amount due the clients.  See id.

The other judges in Cotnam, Rives and Brown, in a separate opinion, stated that the claim involved was far from being perfected and that it was the attorney's efforts that perfected or converted the claim into a judgment.  Judge Wisdom, in the second of his opinions, dissented, reasoning that the taxpayer had a right to the already-earned income and that it could not be assigned to the attorneys without tax consequence to the assignor.  The Cotnam holding with respect to the Alabama attorney lien statutes has been distinguished by this Court from cases interpreting the statutes of numerous other states. Significantly, this Court has, for nearly 40 years, not followed

Cotnam with respect to the analysis in the opinion of Judges Rives and Brown that the attorney's fee came within an exception to the assignment of income doctrine. See, e.g., Estate of Gadlow v. Commissioner, 50 T.C. 975, 979-980 (1968) (Pennsylvania law); O'Brien v. Commissioner, 38 T.C. 707, 712 (1962), affd. per curiam 319 F.2d 532 (3d Cir. 1963); Petersen v. Commissioner, 38 T.C. 137, 151-152 (1962) (Nebraska law and South Dakota law); Srivastava v. Commissioner, T.C. Memo. 1998-362, on appeal (5th Cir., June 14, 1998) (Texas law); Coady v. Commissioner, T.C. Memo. 1998-291, on appeal (9th Cir., Nov. 3, 1998) (Alaska law).

Addressing the assignment of income question in similar circumstances, the U.S. Court of Appeals for the Federal Circuit reached a result opposite from that reached in Cotnam. See Baylin v. United States, 43 F.3d 1451, 1454-1455 (Fed. Cir. 1995). In Baylin, a tax matters partner entered into a contingent fee agreement with the partnership's attorney in a condemnation proceeding. When the litigants entered into a settlement, the attorney received his one-third contingency fee directly from the court in accordance with the fee agreement. On its tax return, the partnership reduced the amount realized from the condemnation by the amount of attorney's fees attributable to recovery of principal and deducted from ordinary income the attorney's fees attributed to the interest income portion of the settlement. The Government challenged this classification of the

attorney's fees, determining that the attorney's fees constituted a capital expenditure and could, therefore, not reduce ordinary income.

The Court of Federal Claims agreed with the Government. On appeal, the taxpayer argued that the portion of the recovery used to pay attorney's fees was never a part of the partnership's gross income and should be excluded from gross income. The Federal Circuit, rejecting the taxpayer's argument, held that even though the partnership did not take possession of the funds that were paid to the attorney, it "received the benefit of those funds in that the funds served to discharge the obligation of the partnership owing to the attorney as a result of the attorney's efforts to increase the settlement amount." Id. at 1454. The Court of Appeals for the Federal Circuit sought to prohibit taxpayers in contingency fee cases from avoiding Federal income tax with "skillfully devised" fee agreements. See id.

The U.S. Court of Appeals for the Ninth Circuit reached the same result as the court in Baylin regarding the includability of attorney's fees in a taxpayer's gross income. In Brewer v. Commissioner, 172 F.3d 875 (9th Cir. 1999), affg. without published opinion T.C. Memo. 1997-542, the Court of Appeals affirmed the Tax Court decision holding that the portion of a Title VII settlement that was paid directly to the taxpayer's attorney was not excludable from the taxpayer's gross income.

In a recent holding, the U.S. Court of Appeals for the Sixth Circuit reached a result based on similar reasoning to that used in Cotnam.  See Estate of Clarks v. United States, 202 F.3d 854 (6th Cir. 2000).  In Estate of Clarks, after a jury awarded the taxpayer personal injury damages and interest, the judgment debtor paid the taxpayer's lawyer the amount called for in the contingent fee agreement.  Because the portion of the attorney's fee that was attributable to the recovery of taxable interest was paid directly to the attorney, the taxpayer excluded that amount from gross income on the estate's Federal income tax return.  The Commissioner determined that the portion of the attorney's fees attributable to interest was deductible as a miscellaneous itemized deduction and was not excludable from gross income.  The taxpayer paid the deficiency and sued for a refund in Federal District Court.

The District Court granted summary judgment in favor of the Government.  The U.S. Court of Appeals for the Sixth Circuit reversed, employing reasoning similar to that used in Cotnam. The Court of Appeals held that, under Michigan law, the taxpayer's contingent fee agreement with the lawyer operated as a lien on the portion of the judgment to be recovered and transferred ownership of that portion of the judgment to the attorney.  The court seemed to place greater emphasis on the fact that the taxpayer's claim was speculative and dependent upon the

services of counsel when it was assigned. In that respect, the court held that the assignment was no different from a joint venture between the taxpayer and the attorney. The court explained that this case was distinguishable from other assignment of income cases in that there was "no vested interest, only a hope to receive money from the lawyer's efforts and the client's right, a right yet to be determined by judge and jury." Id. at 857. The court stated:

> Here the client as assignor has transferred some of the trees in his orchard, not merely the fruit from the trees. The lawyer has become a tenant in common of the orchard owner and must cultivate and care for and harvest the fruit of the entire tract. Here the lawyer's income is the result of his own personal skill and judgment, not the skill or largess of a family member who wants to split his income to avoid taxation. The income should be charged to the one who earned it and received it, not as under the government's theory of the case, to one who neither received it nor earned it. The situation is no different from the transfer of a one-third interest in real estate that is thereafter leased to a tenant. [Id. at 858.[4]]

This Court has, for an extended period of time, held the view that taxable recoveries in lawsuits are gross income in their entirety to the party-client and that associated legal fees--contingent or otherwise--are to be treated as deductions.[5]

---

[4] The Court of Appeals' analogy is, to some extent, inapposite because the transfer of trees in and of itself could be consideration in kind and result in gains to the taxpayer. More significantly, if the trees are analogous to the taxpayer's chose in action or compensatory rights, then the transfer represents a classic anticipatory assignment of income.

[5] This view is based on the well-established assignment of
(continued...)

See Bagley v. Commissioner, 105 T.C. 396, 418-419 (1995), affd. 121 F.3d 393, 395-396 (8th Cir. 1997); O'Brien v. Commissioner, 38 T.C. 707, 712 (1962), affd. per curiam 319 F.2d 532 (3d Cir. 1963); Benci-Woodward v. Commissioner, T.C. Memo. 1998-395, on appeal (9th Cir., Feb. 2, 1999). In O'Brien, we held that "even if the taxpayer had made an irrevocable assignment of a portion of his future recovery to his attorney to such an extent that he never thereafter became entitled thereto even for a split second, it would still be gross income to him under" assignment of income principles. O'Brien v. Commissioner, supra at 712. "Although there may be considerable equity to the taxpayer's position, that is not the way the statute is written." Id. at 710. In reaching this conclusion, we rejected the distinction made in Cotnam v. Commissioner, supra, with respect to the Alabama attorney's lien statute, stating that it is "doubtful that the Internal Revenue Code was intended to turn upon such refinements." O'Brien v. Commissioner, supra at 712. Numerous decisions of this Court have reached the same result as O'Brien by distinguishing other States' attorney's lien statutes from the Alabama statute considered in Cotnam. See Estate of Gadlow v. Commissioner, 50 T.C. 975, 979-980 (1968) (Pennsylvania law); Petersen v.

---

⁵(...continued)
income doctrine that was originated by the Supreme Court in Lucas v. Earl, 281 U.S. 111 (1930). Lucas v. Earl, supra, has been relied on by this Court for assignments of income involving both related and unrelated taxpayers.

Commissioner, 38 T.C. 137, 151-152 (1962) (Nebraska law and South Dakota law); Sinyard v. Commissioner, T.C. Memo. 1998-364, on appeal (9th Cir., Oct. 15, 1999) (Arizona law); Srivastava v. Commissioner, T.C. Memo. 1998-362, on appeal (5th Cir., June 14, 1999) (Texas law); Coady v. Commissioner, T.C. Memo. 1998-291 (Alaska law).

After further reflection on Cotnam and now Estate of Clarks v. United States, supra, we continue to adhere to our holding in O'Brien that contingent fee agreements, such as the one we consider here, come within the ambit of the assignment of income doctrine and do not serve, for purposes of Federal taxation, to exclude the fee from the assignor's gross income. We also decline to decide this case based on the possible effect of various States' attorney's lien statutes.[6]

---

[6] With the exception of situations where, under our holding in Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we feel compelled to follow the holding of a Court of Appeals, we have consistently held that attorney's fees are not subtracted from taxpayers' gross income to arrive at adjusted gross income. In Davis v. Commissioner, T.C. Memo. 1998-248, affd. per curiam ___ F.3d ___ (11th Cir. 2000), we followed Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), affg. in part and revg. in part 28 T.C. 947 (1957), because the appeal would lie to the Court of Appeals for the 11th Circuit, which follows precedents of the Court of Appeals for the 5th Circuit for cases decided before Oct. 1, 1982. In a per curiam opinion, the Court of Appeals for the 11th Circuit affirmed our decision based on the binding Cotnam precedent and declined to consider the Commissioner's argument that Cotnam was wrongly decided, noting that Cotnam can be overruled only by the court sitting en banc. See Davis v. Commissioner, __ F.3d __ 2000 WL 491747 (11th Cir. 2000); see also Foster v. United States, __ F. Supp. 2d __ (N.D. Ala., Mar. 13, 2000), on appeal
(continued...)

Section 61(a) provides that "gross income means all income from whatever source derived," and typically, all gains are taxed unless specifically excluded. See <u>James v. United States</u>, 366

---

[6](...continued)
(11th Cir., Apr. 10, 2000), where the District Court generally followed <u>Cotnam</u> as binding precedent, but denied litigation cost explaining:

> The court does not find, however, that under § 7430(c)(4)(A)(i) the position of the United States (i.e., with respect to <u>Cotnam</u>) was not substantially justified. Yes, the court does conclude that <u>Cotnam</u> does control most of the issues respecting attorney's fees and, until the Court of Appeals or Supreme Court rules otherwise, is binding on this court.

> But there are serious and legitimate questions as to whether the holding in <u>Cotnam</u> should continue to be followed in this or other circuits. Strong arguments can be made--and presumably will be made by the government in seeking en banc consideration of this issue in the <u>Davis</u> case or on appeal of this case--that <u>Cotnam</u> is not consonant with Supreme Court decisions like <u>Horst</u> and, indeed, is based on a misinterpretation of Alabama law involving contingent fee contracts and attorneys' lien rights. In particular, <u>Cotnam</u> did not give attention to the continuing control that, even after entering into a contingent fee contract, the tort plaintiff has with respect to settlement of the entirety of the claim or to the continuing power of the client to discharge an attorney and effectively cancel the "assignment" of a share in later recoveries. The 1998 appeal by the government of <u>Davis</u>, filed before this case was brought, indicated that its attack upon <u>Cotnam</u> represents a fundamental disagreement with that decision, and not some personal animus against Foster in the present case. The rejection in January 2000 by a second appellate court (the Sixth Circuit in the <u>Estate of Clarks</u> case) does not support an assertion that the government's [sic] in this case was without substantial foundation. This court determines that Foster is not entitled to litigation costs under § 7430.

U.S. 213, 219 (1961). We can identify no specific exclusion from gross income for the payment made to Fox & Fox. While it is true that petitioner did not physically receive the portion of the settlement proceeds used to pay the attorney's fees, he did receive the full benefit of those funds in the form of payment for the services required to obtain the settlement. At the time that petitioner entered into the contingent fee agreement, he had already been discriminated against in the form of his wrongful termination from employment. In other words, petitioner was owed damages, and the attorney was willing to enter into a contingent fee agreement to recover the damages owed to petitioner. Therefore, petitioner must recognize as income the amount of the judgment.

In coming to this conclusion, we reject the significance placed by the U.S. Court of Appeals for the Sixth Circuit on the speculative nature of the claim and/or that the claim was dependent upon the assistance of counsel. Despite characterizing petitioner's right to recovery as speculative, his cause of action had value in the very beginning; otherwise, it is unlikely that Fox & Fox would have agreed to represent petitioner on a contingent basis. We find no meaningful distinction in the fact that the assistance of counsel was necessary to pursue the claim. Attorney's fees, contingent or otherwise, are merely a cost of litigation in pursuing a client's personal rights. Attorneys

represent the interests of clients in a fiduciary capacity.  It
is difficult, in theory or fact, to convert that relationship
into a joint venture or partnership.  The entire ADEA award was
"earned" by and owed to petitioner, and his attorney merely
provided a service and assisted in realizing the value already
inherent in the cause of action.

An anticipatory assignment of the proceeds of a cause of
action does not allow a taxpayer to avoid the inclusion of income
for the amount assigned.[7]  A taxpayer who enters into an agreement
for the rendering of services that assists in the recovery from a
third party must include the amount recovered (compensation) in
gross income, irrespective of whether it is received by the
taxpayer.  See Hober v. Commissioner, T.C. Memo. 1984-491;
Loeffler v. Commissioner, T.C. Memo. 1983-503.  This Court,
relying on Lucas v. Earl, 281 U.S. 111 (1930), has consistently

---

[7] The assignment by a taxpayer of a right to collect a
doubtful and uncertain pending claim against the United States in
exchange for cash and other consideration did not constitute an
anticipatory assignment of income in Jones v. Commissioner, 306
F.2d 292 (5th Cir. 1962), revg. T.C. Memo. 1960-115, and thus the
taxpayer was not taxable on the amount ultimately recovered on
the claim.  In Reffett v. Commissioner, 39 T.C. 869 (1963),
however, we distinguished Jones in a factual setting similar to
this case and held that proceeds from a taxpayer's lawsuit that
were paid to witnesses for their services during the lawsuit were
includable in the taxpayer's gross income.  In addition, the U.S.
Court of Appeals for the Ninth Circuit has factually
distinguished Jones and held that an attorney's transfer of part
of a contingent legal fee earned by him was an assignment of
income within the meaning of Lucas v. Earl, 281 U.S. 111 (1930).
Koshansky v. Commissioner, 92 F.3d 957, 958 (9th Cir. 1996),
affg. in part, revg. in part T.C. Memo. 1994-160.

held that a taxpayer cannot avoid taxation on his income by an anticipatory assignment of that income to another. See id. Thus, any anticipatory assignment by the taxpayer of the proceeds of the lawsuit must be included in the taxpayer's gross income.

We reject petitioner's contention that he had insufficient control over his cause of action to be taxable on a recovery of a portion of the settlement proceeds that was diverted to or paid to Fox & Fox under the contingent fee agreement. There is no evidence supporting petitioner's contention that he had no control over his claim. In Wisconsin, a lawyer cannot acquire a proprietary interest that would enable the attorney to continue to press a cause of action despite the client's wish to settle. Indeed, the Supreme Court of Wisconsin has stated that "The claim belongs to the client and not the attorney, the client has the right to compromise or even abandon his claim if he sees fit to do so." Goldman v. Home Mut. Ins. Co., 22 Wis. 2d 334, 341, 126 N.W.2d 1 (1964).

Likewise, petitioner has not waived his right to settle his claim at any time, and it would be an ethical violation for his attorney to press forward with such a case against the will of the client. Wisconsin Supreme Court rule 20:1.2(a) provides:

> A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall inform a client of all offers of settlement and

abide by a client's decision whether to accept an offer of settlement of a matter. * * *

Although petitioner may have entrusted Fox & Fox with the details of his litigation, ultimate control was not relinquished. If petitioner wanted to proceed without Fox & Fox, he could have obtained new representation.

The assignment of income doctrine was originated by the Supreme Court and has evolved over the past 70 years. See Helvering v. Eubank, 311 U.S. 122 (1940); Helvering v. Horst, 311 U.S. 112 (1940); Lucas v. Earl, supra. Although legislation may result in anomalous or inequitable results with respect to particular taxpayers, we are not in a position to address those policy questions. So, for example, if the AMT computation effectively renders de minimis a taxpayer's recovery due to the nondeductibility of the attorney's fees, we should not be tempted to modify established assignment of income principles to remedy the situation. That could result in a certain class of taxpayer's (those who receive reportable income from judgments) being treated differently from all other taxpayers who are subject to the AMT. These are matters within Congress' authority to decide. Congress, not the Courts, is the final arbiter of how the tax burden is to be borne by taxpayers.

Even if we were willing to follow the Cotnam and/or Estate of Clarks "attorney's lien" rationale, our analysis of the Wisconsin statutes and case law would not result in excluding the

attorney's fee from petitioners' gross income here. In Cotnam, the Alabama statute provided that "attorneys at law shall have the same right and power over said suits, judgments and decrees, to enforce their liens, as their clients had or may have for the amount due thereon to them." Cotnam v. Commissioner, 263 F.2d 119, 125 n.5 (5th Cir. 1959) (quoting Ala. Code sec. 64 (1940)). The relevant Wisconsin statute does not recognize the same right and power in favor of attorneys that was identified in the Alabama attorney's lien statute. The Wisconsin statute provides:

> Any person having or claiming a right of action, sounding in tort or for unliquidated damages on contract, may contract with any attorney to prosecute the action and give the attorney a lien upon the cause of action and upon the proceeds or damages derived in any action brought for the enforcement of the cause of action, as security for fees in the conduct of the litigation; when such agreement is made and notice thereof given to the opposite party or his or her attorney, no settlement or adjustment of the action may be valid as against the lien so created, provided the agreement for fees is fair and reasonable. This section shall not be construed as changing the law in respect to champertous contracts. [Wis. Stat. Ann. sec. 757.36 (West 1981).]

This statute provides for an attorney's lien upon the cause of action or upon the proceeds or damages from such cause of action to secure compensation, but it does not give attorneys the same rights as their clients over the proceeds of suits, judgments, and decrees. Accordingly, the Wisconsin statute contains obvious differences and is distinguishable from the Alabama statute.

A 100-year-old Wisconsin case contains an indication that at one time, an attorney in Wisconsin may have had the type of rights described in Cotnam. See Smelker v. Chicago & N.W. Ry., 106 Wis. 135, 81 N.W. 994 (1900). In Smelker, the Wisconsin Supreme Court held that an attorney could press the underlying cause of action to enforce the attorney's lien even after the client had settled. While the Wisconsin court expressed doubt about the propriety of such a policy, the statutory lien provision in effect at the time appeared to the court to require such a result. At the time of Smelker, the statute provided for attorney's liens only on the "cause of action". As such, the Wisconsin Supreme Court reasoned that the only way an attorney's lien could withstand settlement was if the cause of action could continue at the behest of the attorney. This is no longer the situation. The Wisconsin attorney's lien statute was revised after the decision in Smelker. The statute in effect for purposes of this case provides for an attorney's lien on the cause of action as well as the proceeds or damages from the cause of action and does not give the attorney the right to continue an action after the client settles. See Wis. Stat. Ann. sec. 757.36 (1981). In light of the statement in Goldman v. Home Mut. Ins. Co., supra, that a claim belongs to the client and not the attorney, the fact that Smelker has only been cited by a Wisconsin court once (in 1902 and even then not for the

proposition that attorneys have the same rights and power over suits as their clients), and the fact that Wisconsin's attorney's lien statute was revised, Smelker has not retained its vitality, and we do not read it as standing for the proposition that attorneys in Wisconsin have the same rights as their clients over suits.

We conclude that petitioner's award, undiminished by the amount that he paid to Fox & Fox, is includable in his 1993 gross income. The amount paid to Fox & Fox is deductible subject to certain statutory limitations as determined by respondent. We have also considered petitioners' remaining arguments and, to the extent not mentioned herein, find them to be without merit. To reflect the foregoing,

Decision will be entered

under Rule 155.

Reviewed by the Court.

COHEN, WHALEN, CHIECHI, LARO, GALE, THORNTON, and MARVEL, JJ., agree with this majority opinion.

HALPERN, FOLEY, and VASQUEZ, JJ., did not participate in consideration of this opinion.

CHABOT, J., dissenting: The majority opinion sets forth
supra at note 3 and the accompanying text (majority op. pp. 13-
15) concerns as to the injustice resulting from the intersection
of court-made doctrine and statute law--in particular the minimum
tax. The majority opinion states that "these policy issues are
in the province of Congress" (majority op. p. 15) and refuses to
modify court-made doctrine. Although I agree with the majority
that "we are not authorized to rewrite the statute" (majority op.
p. 15), I reject the idea that we are disabled from correcting
court-made error, and so I dissent.

The assignment of income doctrine was created by the courts
to deal with situations where the taxpayer figuratively turned
his or her back on income that would have come to and been
taxable to the taxpayer, but for the taxpayer's effort to shift
the receipt and taxability of the income. See the three seminal
opinions cited by the majority (majority op. p. 27)--Lucas v.
Earl, 281 U.S. 111 (1930) (husband assigned to wife half of
salary and fees that he earned; Federal taxing statute treats
assigned amounts as taxpayer's income); Helvering v. Eubank, 311
U.S. 122 (1940) (taxpayer assigned to corporate trustees
insurance renewal commissions; taxpayer remains taxable on the
insurance renewal commissions he had earned); Helvering v. Horst,
311 U.S. 112 (1940) (taxpayer assigned to son negotiable bond

interest coupons; taxpayer remains taxable on the income that he would have received but for the transfer).  The Supreme Court made clear that these results were based on the Court's reading of the statute as to what was income of the taxpayer rather than income of another; the intended result was to tax the taxpayer on the income the taxpayer would have had if he or she had acted to "earn" the income but had not acted to deflect the income.

Those seminal cases did not present disputes about the amount of the income, but they focused on whether the taxpayer had succeeded in deflecting the taxation of it to others.

As the majority opinion notes, there is later case law dealing with how to measure the amount of the income.  This case law is, in part, responding to needs to interpret and apply intricate "spread-back" provisions and, in part, to fill in the gaps in statutory text that become evident when a statute has to be applied to the real world.  The concepts developed by the courts seemed to be reasonable and seemed to produce reasonable results.  However, the statutory background has changed over the decades.  For example the Congress repealed more than 30 years ago the statute referred to in the majority opinion's quotation (majority op. p. 21) from O'Brien v. Commissioner, 38 T.C. 707, 710 (1962), affd. 319 F.2d 532 (3d Cir. 1963).  Application of court-made rules to the new background has exposed analytical errors that were originally overlooked because the harm created

was not then regarded as serious. That is, we held that the taxpayers in O'Brien v. Commissioner, supra, and in Cotnam v. Commissioner, 28 T.C. 947 (1957), revd. on this issue and affd. on other issues 263 F.2d 119 (5th Cir. 1959), were entitled to some but not all of the relief they claimed from the general application of the annual accounting period rules.[8]

However, as the majority opinion notes (majority op. pp. 13-15), continued application of the court-made rules, in this era of minimum tax can raise effective tax rates to hardship levels

---

[8]The statute referred to in O'Brien v. Commissioner, 38 T.C. 707, 710 (1962), affd. 319 F.2d 532 (3d Cir. 1963), is sec. 1303, I.R.C. 1954, which provided a "cap" on taxation of back-pay awards, calculated by "spreading back" the award over the years to which the awarded amounts were attributable. We held that the gross award was to be spread back, unreduced by the taxpayer's costs of obtaining the award. We noted that the taxpayer merely was being denied a special, limited relief from the normal incidences of income taxation, and that he remained entitled to deduct his legal fees for the year the award was made. See O'Brien v. Commissioner, 38 T.C. at 710, 712. In O'Brien v. Commissioner, 38 T.C. at 711, we relied on Smith v. Commissioner, 17 T.C. 135 (1951), revd. on another issue 203 F.2d 310 (2d Cir. 1953), in which we had ruled the same way under sec. 107(d), I.R.C. 1939, the predecessor of sec. 1303, I.R.C. 1954. In Smith v. Commissioner, 17 T.C. at 144, the taxpayer wanted the gross award spread back and the expenses deducted for the year of the award, while the Commissioner argued for spreading back the net cost; we held for the taxpayer. In Cotnam v. Commissioner, 28 T.C. 947, 953-954 (1957), revd. on this issue and affd. on other issues 263 F.2d 119 (5th Cir. 1959), we also held that the gross award was to be spread back under sec. 107(d), I.R.C. 1939, and the expenses deductible for the year of the award.

The spread-back provisions that were the foundations for Smith, Cotnam, and O'Brien were repealed by the Revenue Act of 1964, Pub. L. 88-272, sec. 232(a), 78 Stat. 19, 105, effective for taxable years beginning after Dec. 31, 1963. See Pub. L. 88-272, sec. 232(g)(1), 78 Stat. 112.

in some real-world instances.  The problem arises not from the statute, but rather from the court-made elaboration of the assignment of income doctrine and from our refusal to reexamine the rules that we have devised.  I agree with the majority that the Congress has the power to revise the statute to reduce or eliminate the effect of court-made errors, but the courts also have the right and obligation to correct their own errors.

In Teschner v. Commissioner, 38 T.C. 1003 (1962), a majority of this Court reexamined several of the seminal cases, rejected respondent's efforts to analyze by slogan,[9] and determined that

---

[9]In Teschner v. Commissioner, 38 T.C. 1003, 1007 (1962), we explained as follows:

> In his ruling, the respondent declared, "The basic rule in determining to whom an item of income is taxable is that income is taxable to the one who earns it."  If by this statement the respondent means that income is in all events includible in the gross income of whomsoever generates or creates the income by virtue of his own effort, the respondent is wrong.  If this were the law, agents, conduits, fiduciaries, and others in a similar capacity would be personally taxable on the proceeds of their efforts.  The charity fund-raiser would be taxable on sums contributed as the result of his efforts.  The employee would be taxable on income generated for his employer by his efforts.  Such results, completely at variance with every accepted concept of Federal income taxation, demonstrate the fallacy of the premise.

> If, on the other hand, the respondent used the term "earn," not in such a broad sense, but in the commonly accepted usage of "to acquire by labor, service, or performance; to deserve and receive compensation" (Webster's New International Dictionary),[4] then the rule is intelligible but does not support the conclusion reached by the respondent

(continued...)

the taxpayer therein was not taxable on the prize that his daughter received as a result of the taxpayer's successful entry in a contest. Under the rules of the contest, only persons under the age of 17 years and 1 month were eligible to receive prizes. See id. at 1004. Any contestant over that age was required to designate a person below that age as the recipient of the prize. See id. at 1004. The taxpayer designated his daughter as recipient. See id. at 1005. The taxpayer did not play any part in creating this restrictive rule. Although the contest was described as a "Youth Scholarship Contest", the contest rules did not limit the daughter in her use of the prize, a fully paid-up annuity policy. See id. at 1005. The prize was worth $1,287.12; respondent included this amount in the taxpayer's income and determined a deficiency of $283.16. See id. at 1004, 1005. We summarized our conclusion as follows, id. at 1009:

> Granted that an individual cannot escape taxation on income to which he is entitled by "turning his back" upon that income, the fact remains that he must have received the income or had a right to do so before he is taxable thereon. As noted by the court in United States v. Pierce, 137 F.2d 428, 431 (C.A. 8, 1943):
>
>> The sum of the holdings of all cases is that for purposes of taxation income is

---

⁹(...continued)
either in the ruling in question or in the case before us. The taxpayer there, as here, acquired nothing himself; he received nothing nor did he have a right to receive anything.

---

⁴    Cf. Cold Metal Process Co. v. Commissioner, 247 F.2d 864, 872 (C.A. 6, 1957).

attributable to the person entitled to receive it, although he assigns his right in advance of realization, and although, in the case of income derived from the ownership of property, he transfers the property producing the income to another as trustee or agent, in either case retaining all the practical benefits of ownership.

Section 1(a) of the 1954 Code imposes a tax on the "income of every individual."  Where an individual neither receives nor has the right to receive income, he is not the taxable individual within the contemplation of the statute.  There is no basis in the statute or in the decided cases for a construction at variance with this fundamental rule.

Reviewed by the Court.

<u>Decision will be entered</u>
<u>for the petitioners</u>.

The majority in the instant case tax to petitioners substantial funds that petitioners did not receive, were never entitled to receive, and never turned their backs on.  They do so in the name of the assignment of income doctrine.  The majority acknowledge that there may be injustice in so doing, and that the injustice may well be even greater in other real-life settings than in the instant case.  They contend that precedents compel them to this result and that relief can come only from the hills (Psalm 121), or at least from Capitol Hill.  But this Court has shown in <u>Teschner v. Commissioner</u>, <u>supra</u>, that reexamination of the origins of the assignment of income doctrine can sharpen our understanding of the concepts and make more rational the application of that doctrine.  We do not lightly overrule our

prior decisions.  But when experience and analysis show that we have departed from the origins that we once thought to be the foundations of those decisions, and when it is our judicial interpretations and not the statute law that lead to results that increasingly seem to be unjust, then we ought to reexamine the foundations of the doctrine.  See in this connection Phillips v. Commissioner, 86 T.C. 433 (1986), affd on this issue and revd. on another issue 851 F.2d 1492 (D.C. Cir. 1988).

We should not declare ourselves incapable of self-correction, merely because we chose to follow a wrong path decades ago.

Respectfully, I dissent.

PARR, WELLS, COLVIN, and BEGHE, JJ., agree with this dissenting opinion.

BEGHE, J., dissenting:  As presiding judge at the trial of this case, my disagreement with the majority is neither a dispute about evidentiary facts nor a doctrinal dispute as such.  What divides me from the majority--notwithstanding the majority have adopted my proposed factual findings pretty much verbatim--is a disagreement about the significance of those facts.  In my view, those facts do not call for application of the assignment of income doctrine.

The recitals and reasoning in support of my efforts to decide this case in favor of petitioners go on and on at such length that I provide a Table of Contents.

Findings and Resulting Inferences . . . . . . . . . . . . . . .  39

Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 44
    1.  Issue Is Ripe for Reexamination . . . . . . . . . .  44

    2.  Tax Court's Jurisprudence on Tax Treatment of
        Contingent Fees--Dicta for Case at Hand . . . . .  48

    3.  Another Reason for Reexamination:  Repeal of
        Statutory Spreadback and Averaging Provisions . .  54

    4.  Cotnam and Estate of Clarks . . . . . . . . . . . .  56
        i.  Narrow Ground--Significance of State Law . .  60
       ii.  Broader Ground--Federal Standard . . . . . .  66

    5.  Significance of Control in Supreme Court's
        Assignment of Income Jurisprudence . . . . . . . .  70

    6.  Substantial Reduction of Claimant's Control
        by Contingent Fee Agreement . . . . . . . . . . .  75
        i.  "Contract of Adhesion" . . . . . . . . . . .  76
       ii.  American Bar Foundation Contingent
          Fee Study . . . . . . . . . . . . . . . . .  77
     iii.  "Two Keys" Simile . . . . . . . . . . . . . .  80

    7.  Omissions and Distortions:  the Majority Opinion . .  82

    8.  Majority Opinion's Handling of Authorities . . . . .  86

9.  Preventing Tax Avoidance by Other Transferors  . . .  89

10.  Cropsharing as Alternative to Joint
      Venture/Partnership Analogy . . . . . . . . . . .  90

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . .  97

Findings and Resulting Inferences

I would find the ultimate fact that the elements of control over the prosecution of the ADEA claims ceded by Mr. Kenseth and assumed and exercised by Fox & Fox under the contingent fee agreement make it reasonable to include in petitioners' gross income only Mr. Kenseth's net share of the settlement proceeds, $138,201.[10]  This means that, in computing Mr. Kenseth's gross income from the settlement, his share of the proceeds should be offset by the $91,800 portion of Fox & Fox's $1,060,000 contingent fee that reduced his share of such proceeds, not by

---

[10] In Helvering v. Horst, 311 U.S. 112 (1940) (gift of bond interest coupons to taxpayer's son), Justice Stone pointed out that the ultimate question in deciding whether the assignment of income rule applies is a question of fact whose answer should be informed by the perceptions and reactions of the trier of fact to the total situation:

> To say that one who has made a gift thus derived from interest or earnings paid to his donee has never enjoyed or realized the fruits of his investment or labor because he has assigned them instead of collecting them himself and then paying them over to the donee, is to affront common understanding and to deny the facts of common experience.  Common understanding and experience are the touchstones for the interpretation of the revenue laws. [Helvering v. Horst, 311 U.S. at 117-118; emphasis supplied.]

See also Helvering v. Clifford, 309 U.S. 331, 338 (1940), discussed, cited, and quoted infra p. 47.

including $229,501 in his gross income and treating his share of the fee as an itemized deduction, subject to the alternative minimum tax (AMT).[11]

The following evidentiary facts and inferences therefrom support this ultimate finding.

The contingent fee agreement was a standardized form contract prepared by Fox & Fox. Fox & Fox would have declined to represent Mr. Kenseth if he had not entered into the contingent fee agreement and agreed to the attorney's lien provided therein.

Mr. Kenseth and the 16 other members of the class had a common grievance arising from APV's terminations of their employment. That grievance impelled them to retain the same law firm to advise them and prosecute their claims for redress. Once that law firm had entered an identical contingent fee agreement with each claimant, there was a substantial additional practical impediment--as compared with a sole plaintiff who enters into a contingent fee agreement--to Mr. Kenseth or any other class member firing Fox & Fox and hiring other attorneys. That impediment became even more substantial as the prosecution of the claims by Fox & Fox progressed, from the filing of the administrative claims, to the commencement of the class action

_____

[11] On occasion, the Commissioner has inadvertently taken this position. See Coblenz v. Commissioner, T.C. Memo. 2000-131.

lawsuit in the District Court, to settlement negotiations and reaching of an agreement with APV and its attorneys.

In contrast to the unconditional personal liability Mr. Kenseth assumed to pay his share of out-of-pocket expenses, he did not agree to pay a fee, only to the modes of computation and payment of the contingent fee to which Fox & Fox would be entitled from the proceeds of any recovery.  If there had been no recovery, Fox & Fox would have received nothing.

The contingent fee agreement required aggregation of the elements of any settlement offer divided between damages and attorney's fees and provided that any division of such an offer into damages and attorney's fees would be disregarded by Fox & Fox and Mr. Kenseth.  This means that, if either the defendant's settlement offer or the court's decision had provided for a separate award of attorney's fees, the award of attorney's fees and the damages would have been grossed up to determine the fee that Fox & Fox would be entitled to under the terms of the contingent fee agreement.[12]

The contingent fee agreement provided that Mr. Kenseth could not settle his case against APV without the consent of Fox & Fox. Under Section VIII of the contingent fee agreement, Mr. Kenseth

---

[12] Any issue presented by this provision became moot because there was no agreement with APV or court award for the payment of attorney's fees.

agreed that Fox & Fox "shall have a lien" for its fees and costs against any recovery in Mr. Kenseth's action against APV. This lien by its terms was to be satisfied before or concurrently with the disbursement of the recovery. The contingent fee agreement further provided that if Mr. Kenseth should terminate his representation by Fox & Fox, the firm would have a lien for the fees set forth in Section III of the agreement, and all out-of-pocket expenses that had been disbursed by Fox & Fox would become due and payable by Mr. Kenseth within 10 days of his termination of Fox & Fox as his attorneys.

Mr. Kenseth and the other members of the class relied on the guidance and expertise of Fox & Fox in signing the separation agreement tendered to them by APV and then seeking redress against APV. Commencing with the advice to Mr. Kenseth that he could sign the separation agreement without giving up his age discrimination claim, and culminating with the obtaining by Fox & Fox of an overall settlement and recovery that substantially exceeded what EEOC had thought the case was worth, Fox & Fox made all strategic and tactical decisions in the management and pursuit of the age discrimination claims of Mr. Kenseth and the other class members against APV.

Fox & Fox was well aware of the relationship between any gross settlement amount and the resulting fee that Fox & Fox would be entitled to. In preparing for and conducting

negotiations with APV and its attorneys, Fox & Fox tried to ensure that the amounts actually received by Mr. Kenseth and the other class members would approximate the full value of their claims. Fox & Fox did this by including in their demands on behalf of the claimants an amount for attorney's fees that would be included in and paid out of the settlement proceeds.

The bulk of the settlement proceeds was paid by APV directly to the Fox & Fox trust account, by prearrangement between APV and Fox & Fox.[13] From the gross amount so paid, Fox & Fox paid itself its agreed upon contingent fee of $1,060,000 and computed and apportioned the remaining amount for distribution to Mr. Kenseth and the other class members.[14]

---

[13] Excluding the back pay portion--14.15 percent of the total settlement proceeds and 23.58 percent of the total distribution to class members--paid directly to Mr. Kenseth and the other class members by APV, and from which employment taxes were paid and withheld.

[14] Mr. Kenseth had the largest share of the settlement of any member of the class. The range of amounts distributed to individual class members ranged from 2 percent of the total amount distributed (Mr. Benisch) to 8.6 percent (Mr. Kenseth). Although each class member's back pay portion was the same percentage of his share of the total settlement distributed to class members (23.58 percent), the record does not disclose the basis of the apportionment of the total settlement amount distributed to each member of the class. The uniform apportionment between back pay and the remainder of each claimant's share of the settlement proceeds seems inconsistent with the way in which each claimant's future earnings and benefits were projected over estimated future work life and then discounted back to present value by the economist retained by Fox & Fox to assist in determining the amounts of the claimants' claims. However, this lack of information and apparent

(continued...)

There is no evidence in the record that Mr. Kenseth or any other class member ever expressed dissatisfaction with the services of Fox & Fox or tried to bring in other attorneys to participate in or take over the prosecution of any of the ADEA claims.

## Discussion

My task is to persuade the reader that the governing law permits--indeed compels--the ultimate finding that Mr. Kenseth did not retain enough control over his claim to justify including in his gross income any part of the contingent fee paid to his attorneys.

### 1. Issue Is Ripe for Reexamination

My dissatisfaction with the results of recent cases,[15] antedating publication of Estate of Clarks v. United States, 202

---

[14](...continued)
inconsistency have no bearing on the outcome of this case, other than to indicate uniformity in the treatment of class members consistent with their lack of individual control over the outcome.

[15] The unsatisfactory results of those cases (cited infra notes 21-22), both absolutely and from a horizontal equity standpoint, are highlighted by the treatment of legal fees paid to prosecute claims arising out of the claimant's business as an independent contractor, which are allowed as above-the-line trade or business expense deductions under sec. 162(a). See Guill v. Commissioner, 112 T.C. 325 (1999). Kalinka, "A.L. Clarks Est. and the Taxation of Contingent Fees Paid to an Attorney", 78 Taxes 16, 23 (Apr. 2000), observes that adoption of the view espoused in this dissent will still put in an unfavorable tax position non-business claimants who obligate themselves to pay attorney's fees at hourly rates in order to obtain taxable recoveries. I agree that congressional action would be necessary to change the unfavorable tax result for such claimants.

F.3d 854 (6th Cir. 2000), revg. 98-2 USTC par. 50,868, 82 AFTR 2d

7068 (E.D. Mich. 1998), impelled me to ride the case at hand as

the vehicle to reexamine the Tax Court's treatment of contingent

fees paid to obtain taxable recoveries.  Although this case is

not the most egregious recent example, the mechanical interplay

of the itemized deduction rules with the AMT can result--in cases

in which the contingent fee exceeds 50 percent of the recovery--

in an overall effective rate of Federal income tax and AMT on the

net recovery exceeding 50 percent;[16] in cases in which the

aggregate fees exceed 72-73 percent of the recovery, the tax can

exceed the net recovery, resulting in an overall effective rate

of tax that exceeds 100 percent of the net recovery.[17]

---

[16]  Coady v. Commissioner, T.C. Memo. 1998-291, on appeal
to the Court of Appeals for the Ninth Circuit, may be a case in
point.  The contingent fee and costs approximated 60 percent of
the recovery.

The alternative provision for using the enhanced hourly rate
schedule to calculate the legal fee under Section III of Mr.
Kenseth's contingent fee agreement could result, in a case in
which the recovery is small relative to the time spent on the
case by the attorneys, in a fee substantially greater than the
40-46 percent contingent fee provided by the agreement.  It
should be kept in mind that the enhanced hourly rate provision
was an alternative method of computing the contingent fee, not a
provision for an hourly rate that was payable in all events for
which the client was personally liable, as in Bagley v.
Commissioner, 105 T.C. 396 (1995), affd. on other issues 121 F.3d
393 (8th Cir. 1997), and Estate of Gadlow v. Commissioner, 50
T.C. 975 (1968).

[17] Because of the resulting exposure to two sets of fees,
the lien provisions of contingent fee agreements are a
substantial impediment to replacing original attorneys.  These
situations contain the potential, if the total contingent fees
(continued...)

Even if <u>Estate of Clarks v. United States</u>, <u>supra</u>, had not recently been decided in the taxpayer's favor by the Court of Appeals for the Sixth Circuit, it would be appropriate to revisit this issue. That Congress has not yet responded to comments that the itemized deduction and AMT provisions are working in unanticipated and inappropriate ways that support revision or repeal[18] does not mean that courts are powerless to step in on a

---

[17](...continued)
should exceed approximately 72-73 percent of the gross recovery and be treated as itemized deductions, of resulting in AMT liability--assuming the taxpayer has no substantial other income in the year of recovery--that would exceed the amount of the net recovery. A case in point may be <u>Jones v. Clinton</u>, 57 F. Supp. 2d 719 (E.D. Ark. 1999) in which, after acrimonious dispute among three sets of attorneys, $649,000 of the settlement proceeds of $850,000 were divided among them (the settlement check was made payable to plaintiff and two sets of attorneys), so as to leave only $201,000 for the plaintiff. See "Attorneys For Jones Escalate Fight Over Fees", Washington Times A6 (1/17/99); "Jones' Lawyers Battle Over Fees", Washington Post A9 (1/20/99); "Sharing Jones Settlement", N.Y. Times A16 (3/5/99); see also <u>Alexander v. IRS</u>, 72 F.3d 938, 946-947 (1st Cir. 1995), affg. T.C. Memo. 1995-51, in which the allocated legal fee approximated 73-74 percent of the total recovery, and the fee and the tax liability on it appeared to exceed the net taxable recovery.

[18] See, e.g., Gutman, "Reflections on the Process of Enacting Tax Law", Tax Notes 93, 94 (Jan. 3, 2000) (Woodworth Lecture, delivered Dec. 3, 1999) (itemized deduction phaseouts); IRS National Taxpayer Advocate's Annual Report to Congress, BNA Daily Tax Report GG-1, L-2 (AMT), L-9/10, L-22 (itemized deductions) (Jan. 5, 2000); Meissner, "Repeal or Revamp the AMT: The Time Has Come", 86 Stand. Fed. Tax Rep. (CCH) Tax Focus (Aug 19, 1999); Testimony of Stefan F. Tucker on Behalf of Section of Taxation, American Bar Association, before Subcommittee on Oversight, U.S. House of Representatives, on Revenue Provisions in the President's FY 2000 Budget, Mar. 10, 1999, 52 Tax Law. 577, 580-581 (1999) (AMT and itemized deductions);

(continued...)

case-by-case basis.  As Justice Douglas spoke for the Court in

Helvering v. Clifford, 309 U.S. 331, 338 (1940), responding to

the taxpayer's argument that the then current statutory revocable

trust rules did not by their terms apply to the short-term trust

arrangement under review:

> The failure of Congress to adopt any such rule of thumb
> for that type of trust must be taken to do no more than
> leave to the triers of facts the initial determination
> of whether or not on the facts of each case the grantor
> remains the owner for purposes of § 22(a).  [Emphasis
> supplied.]

What Justices Stone and Douglas said in Horst and Clifford

provides two reminders:  First, the Supreme Court regards the

trial courts, including the Tax Court, as the proper arbiters of

the assignment of income doctrine; it's the trial court's job to

decide whether a taxpayer, who made an intrafamily or related

party transfer or other transfer of rights to future income or of

income producing property, retained sufficient control over what

was transferred to justify taxing the transferor on the income,

rather than the transferee.  Second, the assignment of income

doctrine is judge-made law, not a rule of statutory

interpretation of the more recently enacted itemized deduction

and AMT provisions.  Contrary to the claims of the majority and a

---

     [18](...continued)
ABA/AICPA/TEI/release on 10 ways to simplify the tax code
(including repealing AMT and phasing out phaseouts) Doc. 2000-
5573 Highlights & Documents (Feb. 28, 2000).

recent commentator,[19] we need not wait for Congress to change those provisions.  We're dealing with a problem under the common law of taxation;[20] what the courts have created and applied, courts can interpret, refine, and distinguish to determine whether in changed circumstances the conditions for application of the doctrine have been satisfied.

### 2. Tax Court's Jurisprudence on Tax Treatment of Contingent Fees--Dicta for Case at Hand

The inquiry begins with a reexamination of the original cases--published as regular Tax Court opinions--cited by the majority as originating and applying the rule that the Supreme Court's assignment of income opinions require that a contingent fee be allowed only as a deduction, not as an offset in computing gross income.  All these cases were interpretations and applications of the spreadback provisions of section 107 of the 1939 Code or its statutory successors in the 1954 Code.  What the Tax Court said in these cases about those Supreme Court opinions was dictum.  The Tax Court's recent opinions on the subject, concerning itemized deductions and the AMT, are, with one

---

[19] See Kalinka, "A.L. Clarks Est. and the Taxation of Contingent Fees Paid to an Attorney", 78 Taxes 16 (Apr. 2000).

[20] See Brown, "The Growing 'Common Law' of Taxation", 1961 S. Cal. Tax Inst. 1, 13-21.

distinguishable exception,[21] memorandum opinions, not properly

regarded as binding precedent.[22]

The regular opinions of the Tax Court on which the majority

rely are not directly in point.  There is another ground on which

Smith v. Commissioner, 17 T.C. 135 (1951), revd. on another issue

203 F.2d 310 (2d Cir. 1953); Cotnam v. Commissioner, 28 T.C. 947

(1957), affd. in  part and revd. in part 263 F.2d 119 (5th Cir.

1959); Petersen v. Commissioner, 38 T.C. 137 (1962); O'Brien v.

Commissioner, 38 T.C. 707 (1962), affd. per curiam 319 F.2d 532

(3d Cir. 1963); and Estate of Gadlow v. Commissioner, 50 T.C. 975

(1968), were decided that distinguishes them from the case at

hand.  Each of these earlier cases applied section 107 of the

1939 Code or a similar provision for relief from high marginal

rates of income tax on bunched receipts in one year (or a

relatively short period) of back pay, compensation from an

---

[21] Bagley v. Commissioner, 105 T.C. 396, 418-419 (1995),
affd. on other issues 121 F.3d 393 (8th Cir. 1997), which was not
appealed on this issue, held, among numerous other things, that
hybrid attorney's fees (fixed $50-hourly rate and 25-percent
contingency fee), to extent allocable to taxable portion of
awards, were deductible as itemized deductions under sec. 67(a),
rather than as offsets in computing gross income.  Stated ground
of decision on this issue, not appealed by the taxpayers, was
that fee agreement did not create partnership or joint venture
within meaning of sec. 7701(a)(2) between plaintiff-taxpayer and
attorney.  See infra pp. 70, 90-97.

[22] See, e.g., Benci-Woodward v. Commissioner, T.C. Memo.
1998-395; Sinyard v. Commissioner, T.C. Memo. 1998-364;
Srivastava v. Commissioner, T.C. Memo. 1998-362; Coady v.
Commissioner, supra; Brewer v. Commissioner, T.C. Memo. 1997-542,
affd. without published opinion 172 F.3d 875 (9th Cir. 1999).

employment, etc., attributable to services rendered over a number of years.  The statutory mechanism allowed the taxpayer to compute income tax for the year of receipt as if the back pay or other compensation had been ratably received during the years earned.  The theme of those cases, without regard to assignment of income principles, was this Court's unwillingness to provide relief beyond the express terms of what was felt to be a generous statutory relief provision.

In each of those cases, this Court treated the problem as one of statutory interpretation, before wrapping itself in the mantle of Lucas v. Earl, 281 U.S. 111 (1930), and the Supreme Court's other landmark cases on assignment of income.  So said Judge Raum, speaking for the Court in O'Brien v. Commissioner, 38 T.C. at 710:[23]

> Although there may be considerable equity to the
> taxpayer's position, that is not the way the statute is
> written.  Without the benefit of section 1303 [the 1954
> Code equivalent of 1939 Code section 107], there would
> be no relief whatever, and the relief granted cannot go
> beyond these very provisions.  They provide merely for
> a computation of tax based upon "the inclusion of the
> respective portions of such back pay in the gross
> income for the taxable years to which such portions are

---

[23] The taxpayer in O'Brien v. Commissioner, 38 T.C. 707 (1962), affd. per curiam 319 F.2d 532 (3d Cir. 1963), had not claimed on his return that the fee should offset the recovery, with the resulting reduced amount to be spread back.  The taxpayer had reported on his 1957 income tax return the receipt of a backpay award, had spread back the gross amount of the award over the years of service (1952-1955), and then had apportioned and spread back the legal fees over the same years.  This, the Court held, the statutory spreadback provision did not permit.

respectively attributable."  There is no provision whatever for spreading back any related expenses as was done in petitioner's returns.

Judge Raum saw the situation as identical with that in <u>Smith v. Commissioner</u>, 17 T.C. at 144, quoting what the Court said in that case in upholding the taxpayer's claim of entitlement to the deduction in the year of receipt, notwithstanding that the Commissioner had computed his tax liability by spreading the back pay award over the years of service:

> Without this section, the entire $212,000 would be income in 1945.  Section 107 is silent as to expenses incurred in connection with any collection of back pay, and there are no regulations or decisions which we have been able to find on the question.  To limit application of section 107 to amounts received less expenses connected with collection is not a function for the Court, but rather is a task for Congress if that is the result which they wish.  We therefore hold that petitioner is entitled to deduct the $25,000 legal expense in 1945.

Judge Raum then discussed the opinions of the Tax Court and the Court of Appeals for the Fifth Circuit in <u>Cotnam v. Commissioner</u>, <u>supra</u>, concluding:  "In reaching that conclusion the majority [in the Fifth Circuit] placed considerable stress upon certain provisions of an Alabama statute relating to attorney's liens."[24]  <u>O'Brien v. Commissioner</u>, <u>supra</u> at 712.

---

[24] It's also noteworthy that the final paragraph of Judge Wisdom's dissent in <u>Cotnam v. Commissioner</u>, 263 F.2d 119, 127 (5th Cir. 1959), revg. 28 T.C. 947 (1957), like the opinion of Judge Turner in the Tax Court, and the Tax Court's prior opinion in <u>Smith v. Commissioner</u>, 17 T.C. 135 (1951), revd. on another issue 203 F.2d 310 (2d Cir. 1953), relied upon the lack in sec.

(continued...)

Turning back to the case before him, Judge Raum found that there were no such provisions in Pennsylvania law. Judge Raum then questioned whether State law had any bearing on the matter, inasmuch as the underlying claim had been prosecuted in the United States Court of Claims under Federal law. What followed, Judge Raum's ipse dixit on assignment of income, is dictum. Id.:

> However, we think it doubtful that the Internal Revenue Code was intended to turn upon such refinements. For, even if the taxpayer had made an irrevocable assignment of a portion of his future recovery to his attorney to such an extent that he never thereafter became entitled thereto even for a split second, it would still be gross income to him under the familiar principles of Lucas v. Earl * * *, Helvering v. Horst * * *, and Helvering v. Eubank * * *. The fee, of course, would be deductible, just as it was held to be in Weldon D. Smith. Cf. Walter Petersen * * *. We reach the same result here. Petitioner is entitled to the benefit of section 1303 with respect to his $16,173.05 recovery in 1957 and may deduct the $8,243.10 legal expenses in that year; such legal expenses may not be spread back over earlier years, nor may the same result be achieved indirectly by subtracting the expenses from the recovery and then applying section 1303 to the reduced amount.

Estate of Gadlow v. Commissioner, supra, is the last regular Tax Court opinion in this series. Estate of Gadlow is similarly distinguishable from the case at hand. Like the earlier cases, Estate of Gadlow concerned the application of a provision for computing income tax liability upon the receipt of damages for breach of contract by prorating the recovery over the earlier

---

[24](...continued)
107 of any express provision for allocating expenses against the prorated compensation.

years that the income would have been received but for the breach, section 1305 of the 1954 Code. One of the grounds advanced by the Court in Estate of Gadlow for refusing to follow the Court of Appeals for the Fifth Circuit in Cotnam was that the applicable Pennsylvania law did not contain the Alabama provision.[25]

The Court's opinion in Estate of Gadlow summarized and quoted O'Brien v. Commissioner, supra, and concluded that the spread back provisions under review:

> did not make provision for spreading back related expenses incurred in the collection of back pay. We concluded [in O'Brien] that without specific statutory authority this Court could not allow this treatment. We reach the same conclusion here. [Estate of Gadlow v. Commissioner, supra at 981.]

In the case at hand there is no analogous question of statutory interpretation of a relief provision, only the application of the Federal common law of taxation[26] to determine

---

[25] Estate of Gadlow v. Commissioner, 50 T.C. 975, 980 (1968), is also distinguishable from Cotnam v. Commissioner, 25 T.C. 947 (1957), affd. in part and revd. in part 263 F.2d 119 (5th Cir. 1959), on another ground, not present in the case at hand:

> because Gadlow did not employ the attorneys on a contingent-fee basis as Mrs. Cotnam did, but rather, their fee was fixed solely by the number of hours they worked on Gadlow's case. Therefore, the fee was Gadlow's debt due and owing from Gadlow to his attorneys without regard to the outcome of the litigation.

[26] See supra note 20.

whether the Tax Court can and should apportion the respective gross incomes of client and attorney pursuant to a contingent fee agreement under which the client gives up substantial control over the prosecution and recovery of his claim.

3. Another Reason for Reexamination:  Repeal of Statutory Spreadback and Averaging Provisions

The history of the statutory spreadback provisions is instructive in another respect.[27]  In 1964, those provisions were repealed in favor of general income averaging.[28]  In 1970, Congress enacted the 50-percent maximum tax on earned income, which was in turn repealed in 1981, when the top income tax rate

---

[27] Under the 1954 Code, taxpayers were afforded six targeted spreadback (or averaging) provisions that were intended to mitigate the harsh effects of progressive tax rates on income earned unevenly over the years.  See secs. 1301-1307 (1954 Code). These relief provisions applied only to particular types of income (e.g., employment compensation, back pay, breach of contract damages, income from inventions or artwork, antitrust damages) earned or received over specified periods of time.

[28] Congress amended the targeted averaging provisions in the Revenue Act of 1964, stating that "A general averaging provision is needed to accord those whose incomes fluctuate widely from year to year the same treatment accorded those with relatively stable incomes."  S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 505, 643, 644.  Congress explained that the former targeted averaging provisions were inadequate because they were (1) limited to a relatively small proportion of situations and (2) unduly complicated.  See id. at 644.  Accordingly, Revenue Act of 1964, Pub. L. 88-272, sec. 232(a), 78 Stat. 19, 105 replaced the old provisions (subject to transitional relief) with an averaging device that was available to individual taxpayers generally, regardless of the source of income.  See id.

was reduced to 50 percent.[29]  In 1986, Congress repealed general

income averaging.[30]  All these provisions were tools Congress had

used to ameliorate the top marginal income tax rates that went as

high as or higher than 70 percent during most of the relevant

periods.  After 1986, under the new flatter rate structure, with

a top rate of substantially less than 50 percent, these

provisions were no longer needed.  Against the background of

Congressional concerns about ameliorating a high and steeply

progressive rate structure, I don't believe Congress expected or

intended that the interplay of the newly enacted itemized

deduction and AMT provisions could result in effective rates of

tax substantially exceeding 50 percent up to more than 100

percent of a net recovery.

---

[29] Congress granted another type of relief from the punitive
effects of historically high marginal rates when it enacted the
50 percent maximum tax on personal service income for tax years
beginning after Dec. 31, 1970.  Tax Reform Act of 1969, Pub. L.
91-172, sec. 804(a), 83 Stat. 487, 685 (codified as sec. 1348).
However, such relief subsequently was considered no longer
necessary when Congress reduced the highest marginal tax rate on
all types of income to 50 percent, for taxable years beginning
after Dec. 31, 1981.  Economic Recovery Tax Act of 1981, Pub. L.
97-34, sec. 101(c)(1), 95 Stat. 172, 183.  (repealing sec. 804(a)
of the Tax Reform Act of 1969).

[30] In 1986, Congress repealed the income averaging
provisions almost entirely (exception carved out for farming
income).  Tax Reform Act of 1986, Pub. L. 99-514, sec. 141(a),
100 Stat. 2085, 2117.  Congress believed that changes to the
individual income tax provisions, which provided wider brackets,
fewer rates, and a flatter rate structure with a top marginal
rate substantially less than 50 percent, reduced the need for
complicated income averaging.  See H. Rept. 99-426 (1986), 1986-3
C.B. (Vol. 2) 114.

Contrarywise, the purpose of the AMT is to prevent individuals with substantial economic income from avoiding significant tax liability.[31]  Although we have held that the itemized deduction limitations and the AMT can apply to low and middle-income taxpayers,[32] that doesn't mean that Congress expected or intended that these provisions could result in effective tax rates exceeding 50 percent.  Where their interplay with contingent fees has that potential, courts are entitled to ask whether the plaintiff-claimant's retained control--vis-a-vis the control acquired and exercised by the attorney--is sufficient to justify including in the claimant's gross income the contingent fee the attorney pays himself out of the recovery proceeds.

4.  Cotnam and Estate of Clarks

The inquiry continues with a review of the opinions of the Court of Appeals for the Fifth Circuit in Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), affg. in part and revg. in part 28 T.C. 947 (1957).  The handling of the matter by the Court of Appeals discloses both a narrow ground and a broader ground for its decision.  The numerous occasions we have distinguished Cotnam on the narrow ground have obscured the broader ground and

---

[31] See S. Rept. 99-313, at 518, 1986-3 C.B. (Vol. 3) 1, 518.

[32] See, e.g., Huntsberry v. Commissioner, 83 T.C. 742 (1984); Lickiss v. Commissioner, T.C. Memo. 1994-103.

contributed to our failure to grapple with the issue in a broad-gauged, principled way under the Federal common law of taxation as adopted by the Supreme Court.  Instead, we've been beguiled by "attenuated subtleties" and "refinements" into treating the problem as one of determining the claimant's retained legal rights in his cause of action under State law.

The taxpayer in Cotnam had rendered housekeeping services to an elderly individual during the years 1940-44 in consideration of his promise to bequeath her one-fifth of his estate. Following his death without a will, she entered a contingent fee agreement with attorneys who successfully prosecuted her claim to judgment against the estate.  The check for the $120,000 recovery (plus approximately $5,000 in interest), which was received in 1948, was made payable to the taxpayer and her attorneys.  After endorsement by the payees, the check was deposited in the attorneys' bank account.  Retaining their fee of $50,000, the attorneys gave the taxpayer their check of $75,000 for the balance (amounts rounded off).

The Commissioner determined that the recovery was compensation income rather than a nontaxable bequest and apportioned the gross recovery under section 107 of the 1939 Code over the 4-1/2-years the services were rendered.  In applying section 107, the Commissioner allowed the legal fee as a deduction only in the year paid, in which the taxpayer had

otherwise negligible income against which to deduct the fee,
resulting in a deficiency of more than $36,000.[33]

The Tax Court first held that the recovery was compensation
income rather than a nontaxable bequest; on this issue the Court
of Appeals for the Fifth Circuit unanimously affirmed.  On the
second question, whether the contingent legal fee was excluded
from the compensation to be spread back or merely a useless
deduction in the year of receipt by the attorneys, Judge Wisdom,
writing for the panel, made clear that he disagreed with the
outcome in the taxpayer's favor, stating as follows:

> A majority of the Court, Judges Rives and Brown,
> hold that the $50,365.83 paid Mrs. Cotnam's attorneys
> should not be included in her gross income.  This sum
> was income to the attorneys but not to Mrs. Cotnam.
>
> *    *    *    *    *    *    *
>
> The facts in this unusual case, taken with the
> Alabama statute, put the taxpayer in a position where
> she did not realize income as to her attorneys'
> interests of 40% in her cause of action and judgment.
> [Cotnam v. Commissioner, 263 F.2d at 125.]

---

[33] Because of the high marginal rates of Federal income tax
in effect in 1940-44 and 1948, inclusion of the gross recovery in
1948 income and allowance of the deduction in that year would
have resulted in a greater deficiency than that arising under the
apportionment of the gross income over the prior years under 1939
Code sec. 107, even if the fee were treated as a deduction or
offset for 1948.  The taxpayer was arguing for even greater
relief, that the compensation received in 1948 and apportioned
under sec. 107 over the earlier years should be reduced by the
legal fee.

This is the narrow holding of the Court of Appeals' decision in Cotnam, discussed below in subpart i.[34]

There then followed a statement of the broader ground of the panel's decision, introduced by the following statement: "Judges RIVES and BROWN add to the foregoing, the following", 263 F.2d at 125, and concluding: "Accordingly, the attorneys' fee of $50,365.83 should not have been included in the taxpayer's gross income", 263 F.2d at 126. Then came the dissenting opinion of Judge Wisdom, who had written the opinion for the panel embodying the narrow holding.[35] The disagreement between the additional

---

[34] Although the Tax Court noted that the attorneys "only had a lien on the fund" payable to Mrs. Cotnam and that the attorneys "had no right in or title to" Mrs. Cotnam's recovery sufficient to justify treating them as the owners for tax purposes of any portion of that recovery, it is not clear that the peculiar provisions of Alabama law that provided the narrow holding of the Court of Appeals decision were brought to the attention of the Tax Court. See Cotnam v. Commissioner, 28 T.C. 947, 954 (1957), affd. in part and revd. in part 263 F.2d 119 (5th Cir. 1959). The Tax Court, in sustaining the Commissioner's treatment of the fee as a deduction, did not address the significance (or even advert to the existence) of those provisions (discussed infra pp. 60-66).

[35] Cotnam is a close-to-home example of a judge (Wisdom, J.) writing both the majority opinion and a dissent. Although only rarely does the judge who writes the majority opinion also write separately in concurrence or dissent, it has happened in this Court, Haserot v. Commissioner, 46 T.C. 864, 872-878 (1966) (Tannenwald, J., "speaking separately"), affd. sub nom. Commissioner v. Stickney, 399 F.2d 828 (6th Cir. 1968), and in other courts, see, e.g. City of Baton Rouge v. Ross, 654 So.2d 1311, 1326 (La. 1995) (Calogero, C.J., concurring); Santa Clara County Local Transp. Auth. v. Guardino, 902 P.2d 225, 256 (Cal. 1995) (Werdegar, J. dissenting); Dawkins v. Dawkins, 328 P.2d 346, 353 (Kan. 1958) (Jackson, J., concurring), no less than the
(continued...)

statement of Judges Rives and Brown and Judge Wisdom's dissent is a disagreement about the application of traditional assignment of income principles.  The broader holding, which, the majority and I agree, frames the issue on which the case at hand and other contingent fee cases should be decided, is discussed below in subpart ii.  Of course, the majority agree with Judge Wisdom and I agree with Judges Rives and Brown.

    i.  <u>Narrow Ground--Significance of State Law</u>

In deciding <u>Cotnam v. Commissioner</u>, <u>supra</u>, the majority of the Court of Appeals, in the portion of the panel's opinion written by Judge Wisdom (hereinafter majority opinion), relied heavily on two unusual characteristics of attorney's liens under Alabama law.  The majority opinion noted that the Alabama

---

[35](...continued)
Supreme Court of the United States, see, e.g., <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 438-442 (1982) (separate opinion of Blackmun, J.); <u>Abbate v. United States</u>, 359 U.S. 187, 196-201 (1959) (separate opinion of Brennan, J.); <u>Wheeling Steel Corp. v. Glander</u>, 337 U.S. 562, 574-576 (1949) (separate opinion of Jackson, J.); cf. <u>Helvering v. Davis</u>, 301 U.S. 619, 639-640 (1937) (opinion of Cardozo, J.); <u>Andrew Crispo Gallery, Inc. v. Commissioner</u>, 16 F.3d 1336, 1343-1344 (2d Cir. 1994) (opinion of Van Graafeiland, J.), affg., vacating and remanding in part T.C. Memo. 1992-106; <u>In re Estate of Sayre</u>, 279 A.2d 51, 52 n.2 (Pa. 1971) (opinion of Bell, C.J.).  As Justice Jackson said in <u>Wheeling Steel Corp. v. Glander</u>, <u>supra</u> at 576:  "It cannot be suggested that in cases where the author is the mere instrument of the Court he must forego expression of his own convictions. Mr. Justice Cardozo taught us how justices may write for the Court and still reserve their own positions, though overruled. <u>Helvering v. Davis</u>, 301 U.S. 619, 639."  For discussions of the practice, see Aldisert, Opinion Writing, 168-170 (1990); Llewellyn, The Common Law Tradition: Deciding Appeals 494 (1960).

attorney's lien statute gave an attorney <u>an interest in the client's suit or cause of action</u>, as well as the usual security interest in any judgment or settlement the client might eventually win or receive. See <u>Cotnam v. Commissioner</u>, 263 F.2d at 125; <u>United States Fidelity & Guar. Co. v. Levy</u>, 77 F.2d 972, 975 (5th Cir. 1935) (cited by the majority opinion in <u>Cotnam</u>). The majority opinion also noted that under the Alabama statute "Attorneys have the same rights as their clients." <u>Cotnam v. Commissioner</u>, 263 F.2d at 125. The majority opinion did not explain in detail the sense in which attorneys' and clients' rights were the same. However, the cases cited to support this point make clear the majority opinion was referring to an attorney's right, under Alabama law, <u>to prosecute his client's suit to a final judgment, even after the client has settled the suit with the adverse party</u>. See <u>Denson v. Alabama Fuel & Iron Co.</u>, 73 So. 525 (Ala. 1916); <u>Western Ry. v. Foshee</u>, 62 So. 500 (Ala. 1913).[36]

When we have not followed <u>Cotnam</u>, we have usually relied on differences between the attorney's lien law for the State in issue and Alabama law. See, e.g., <u>Estate of Gadlow v.</u>

_____

[36] We recently followed the decision of the Court of Appeals in <u>Cotnam v. Commissioner</u>, <u>supra</u>, where Alabama law applied. See <u>Davis v. Commissioner</u>, T.C. Memo. 1998-248 (Tax Court constrained to follow Court of Appeals' <u>Cotnam</u> decision under rule of <u>Golsen v. Commissioner</u>, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971)), affd. per curiam __ F.3d __ (11th Cir. 2000). See also <u>Foster v. United States</u>, __ F. Supp.2d __ (N.D. Ala. 2000).

Commissioner, 50 T.C. 975 (1968) (distinguishing Pennsylvania law); Petersen v. Commissioner, 38 T.C. 137 (1962) (Nebraska and South Dakota law); Benci-Woodward v. Commissioner, T.C. Memo. 1998-395 (California law); Sinyard v. Commissioner, T.C. Memo. 1998-364 (Arizona law); Srivastava v. Commissioner, T.C. Memo. 1998-362 (Texas law); Coady v. Commissioner, T.C. Memo. 1998-291 (Alaska law). But see O'Brien v. Commissioner, 38 T.C. 707 (1962) (dictum that State law makes no difference), affd. per curiam 319 F.2d 532 (3d Cir. 1963).[37]

Wisconsin law governed the attorney-client relationship between Fox & Fox and Mr. Kenseth. Wisconsin law arguably gives attorneys the two unusual interests in their clients' lawsuits relied on by the majority opinion in Cotnam v. Commissioner, 263

---

[37] Other Federal courts, in concluding that taxpayer-plaintiffs are taxable on contingent fees paid to their attorneys, have also noted that the State laws in issue do not give attorneys proprietary or equitable interests in their clients' recoveries or causes of action. See Baylin v. United States, 43 F.3d 1451, 1455 (Fed. Cir. 1995) (commenting on Maryland attorney's lien statute); Estate of Clarks v. United States, 98-2 USTC par. 50,868, 82 AFTR 2d 7068 (E.D. Mich. 1998) (distinguishing Cotnam v. Commissioner, supra, on the ground of differences between Michigan and Alabama law), revd. 202 F.3d 854 (6th Cir. 2000)). My view that the tax effects of contingent fee agreements should be decided on the broader ground makes it unnecessary for me to take a position on the view of the Court of Appeals for the Sixth Circuit that the Michigan common law attorney's lien is the equivalent of the proprietary interest of the attorney in the cause of action under Alabama law.

F.2d 119 (5th Cir. 1959).[38]  Although the narrow ground issue need

not detain us indefinitely, a few observations are in order.

Respondent argues that Wisconsin ethical rules prohibit an

attorney from acquiring a "proprietary interest" in a cause of

action he is pursuing for his client.  See Wis. Sup. Ct. R.

20:1.8(j) (1998).  That rule actually states, however, that "A

lawyer shall not acquire a proprietary interest * * * except that

the lawyer may:  (1) acquire a lien granted by law to secure the

lawyer's fee or expenses; and (2) contract with a client for a

reasonable contingent fee in a civil case."  Id. (Emphasis

added.)  Therefore, the rule clearly permits an attorney to

acquire the interests in his client's cause of action

contemplated by the Wisconsin attorney's lien laws; it also

suggests that those interests are proprietary interests.

---

[38] See Smelker v. Chicago & N. W. Ry., 81 N.W. 994, 994
(Wis. 1900), which quoted the Wisconsin attorney's lien statute
as originally enacted in 1891.  Although Smelker is an old case,
diligent research has not disclosed any authority reversing it or
declaring it obsolete.  It is cited and summarized as standing
for the propositions described in the text in 146 A.L.R. 67, 69
(1943) ("ANNOTATION.  Merits of client's cause of action or
counterclaim as affecting attorney's lien or claim for his
compensation against adverse party, in case of compromise without
attorney's consent") and 7 Am. Jur. 2d, Attorneys at Law, sec.
323 (1997) ("Right to continue action client has settled").  Our
opinions distinguishing the decision of the Court of Appeals in
Cotnam v. Commissioner, supra, on the basis of differences in
State law have relied on Pennsylvania cases from 1852 and 1919,
and on Texas cases from 1913 and 1920.  See Estate of Gadlow v.
Commissioner, 50 T.C. 975, 980 (1968) (distinguishing
Pennsylvania law); Srivastava v. Commissioner, T.C. Memo. 1998-
362 (Texas law).

The majority respond with two observations in support of respondent's position:  First, Wis. Stat. 757.36 has been revised to give the attorney a lien "upon the proceeds or damages" as well as "upon the cause of action."  The majority suggest that it is no longer necessary to keep the underlying cause of action alive in order effectively to assert an attorney's lien under Wisconsin law.

The majority also point to Wis. Sup. Ct. R. 20.1.16 and 20.1.2(a) (1998), which include the ethical rules that a client may discharge an attorney at any time and that "a lawyer shall inform a client of all offers of settlement and abide by a client's decision whether to accept an offer of settlement of a matter."  The majority suggest that these rules mean that a Wisconsin attorney cannot acquire an interest in a lawsuit that would enable the attorney to continue to press it in the face of the client's expressed desire to settle, or at least that it would be an ethical violation for the attorney to continue to press a case that the client had settled or desired to settle. Admittedly, the matter is unclear, bearing in mind that Section III of the contingent fee agreement entered by Mr. Kenseth and other class members with Fox & Fox provide that the client can not settle his case without the consent of Fox & Fox, and that the Preamble to the Rules of the Wisconsin Supreme Court governing professional conduct for attorneys says that the rules

are for disciplinary purposes; they are not supposed to affect the substantive legal rights of lawyers and are not designed to be a basis for civil liability.[39]

The Wisconsin courts have recognized the tension between the client's rights to terminate representation and the attorney's rights under contingent fee agreements and the statutory lien. See Goldman v. Home Mut. Ins. Co., 126 N.W.2d 1 (Wis. 1964), cited by respondent and the majority for the proposition that the claim belongs to the client, not the attorney.  However, what Goldman actually said was more balanced:

> it is not against public policy for a client to settle his claim with the tortfeasor or his insurer without participation and consent of the attorney before action is commenced even though the client has retained counsel.   * * * The claim belongs to the client and not the attorney; the client has the right to compromise or even abandon his claim if he sees fit to do so. * * *
>
> We do not hold by inference that a contract between client and attorney whereby the attorney is to control the procedure of the prosecution of the claim, nor that an agreement for a lien upon the cause of action for attorney's fees is against public policy and, therefore, void.  On the contrary, by virtue of the attorney lien statutes and the common law we recognize their validity.  [Id. at 5.]

---

[39] Compare Estate of Newhouse v. Commissioner, 94 T.C. 193, 232-233 (1990), regarding effect on valuation of a right of the necessity of bringing a lawsuit to enforce it; presence of such uncertainty equates with a reduction in claimant-assignor's degree of control; see also Estate of Mueller v. Commissioner, T.C. Memo. 1992-284, on effects of threatened litigation on possible nonconsumation of a stock acquisition as affecting value of the stock.

The Wisconsin courts have also recognized that although a client may have the ultimate power to discharge an attorney or settle a claim, the attorney has rights and remedies when the client breaches or terminates a contingent fee agreement. For example, in Tonn v. Reuter, 95 N.W.2d 261 (Wis. 1959), the Wisconsin Supreme Court held that an attorney who had been discharged without cause could sue his client for breach of contract; the measure of damages was the contingent fee percentage applied to the client's ultimate recovery, less the value of the services the attorney was not required to perform as a result of the breach. And in Goldman v. Home Mut. Ins. Co., supra, the Wisconsin Supreme Court held that a plaintiff's attorney could sue the defendant for third-party interference with contract rights, where the defendant settled with the plaintiff, without the knowledge of the attorney.[40]

ii. Broader Ground--Federal Standard

I now turn to the broader ground of the decision of the Court of Appeals in Cotnam v. Commissioner, supra, as announced by Judges Rives and Brown, and as opposed by Judge Wisdom, and

---

[40] If, on appeal of the case at hand to the Court of Appeals for the Seventh Circuit, the Court of Appeals should wish to obtain answers to any questions of Wisconsin law that the parties have not resolved to its satisfaction, and which it regards as bearing on the outcome, the Wisconsin Supreme Court has power (not obligation) to entertain any such questions put to it by the Court of Appeals under Wis. Stat. sec. 821.01 (1999) (Uniform Certification of Questions of Law Rule).

recently adopted by the Court of Appeals for the Sixth Circuit in Estate of Clarks v. United States, supra. The primary point made by Judges Rives and Brown was that in a practical sense the taxpayer never had control over the portion of the recovery that was retained by her attorneys. In my view, this broader ground disposes of the case at hand in petitioners' favor, independently of the narrow ground.

Judge Wisdom's dissent was very much in the vein that the transaction was governed by the classic assignment of income cases that he cited and relied upon: Helvering v. Eubank, 311 U.S. 122 (1940); Helvering v. Horst, 311 U.S. 112 (1940); and Lucas v. Earl, 281 U.S. 111 (1930). After quoting at length from Helvering v. Horst, supra, Judge Wisdom concluded:

> This case is stronger than Horst or Eubank, since Mrs. Cotnam assigned the right to income already earned. She controlled the disposition of the entire amount and diverted part of the payment from herself to the attorneys. By virtue of the assignment Mrs. Cotnam enjoyed the economic benefit of being able to fight her case through the courts and discharged her obligation to her attorneys (in itself equivalent to receipt of income, under Old Colony Trust Co. v. Commissioner, 1929, 279 U.S. 716 * * *. [Cotnam v. Commissioner, 263 F.2d at 127.]

The majority in Cotnam also rejected the Commissioner's and Judge Wisdom's reliance on Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), because a contingent fee agreement creates no personal obligation. The only source of payment is the recovery; if there is no recovery, the client pays nothing and

the attorney receives nothing.  I agree with this additional point of the Court of Appeals majority in <u>Cotnam</u>.[41]

The points made by the Courts of Appeals in <u>Cotnam</u> and <u>Estate of Clarks v. Commissioner</u>, <u>supra</u>, are not in complete agreement, but their differences don't invalidate the essential on which they do agree.  The Courts of Appeals in <u>Cotnam</u> and <u>Clarks</u> agree that the value of the claim was speculative and dependent on the services of counsel who was willing to take it on a contingent fee basis to try to bring it to fruition.  They also agree that the only benefit the taxpayer could obtain from his or her claim was to assign the right to receive a portion of it (the contingent fee percentage) to an attorney in an effort to collect the remainder and that such benefit does not amount to full enjoyment that justifies including the fee portion in the assignor's gross income.  The Courts of Appeals in <u>Cotnam</u> and <u>Clarks</u> also agree that the proper treatment is to divide the gross income between the client and the attorney, rather than to

---

[41] Regarding the reliance of the Commissioner and Judge Wisdom on <u>Old Colony Trust Co. v. Commissioner</u>, 279 U.S. 716 (1929), I observe, as did Judges Rives and Brown, that the contingent fee was not one that the claimant (Mr. Kenseth) was ever personally obligated to pay, even if there should be a recovery.  Under Sections IV and VIII of the contingent fee agreement (unlike Section II, which personally obligated the client to pay litigation expenses, as defined), the attorneys' right to receive the fee was secured solely by the lien that would attach to any recovery, which was the sole contemplated and actual source of payment of the fee.

include the entire recovery in the client's income and to relegate the client to a deduction that is not fully usable.

I am in complete agreement with Judges Rives and Brown and the panel in Estate of Clarks that the assignment of income doctrine should not apply to contingent fee agreements.  A contingent fee agreement is not an intrafamily donative transaction, or even a transaction within an economic family, such as parent-subsidiary, see United Parcel Serv. of Am., Inc. v. Commissioner, T.C. Memo. 1999-268, or the doctors' service partnership and related HMO in United States v. Basye, 410 U.S. 441 (1973).  Notwithstanding the attorneys' fiduciary responsibilities to their client, a contingent fee agreement is a commercial transaction between parties with no preexisting common interest that sharply reduces or eliminates the client's dominion and control over both the cause of action and any recovery.  Our decisions distinguishing (or just not following) the decision of the Court of Appeals in Cotnam v. Commissioner, supra, have not adequately considered the characteristics of contingent fee agreements or the effect those characteristics should have in deciding whether such agreements should be treated as assignments of income to be disregarded for Federal income tax purposes.

I now address the points of the Court of Appeals for the Sixth Circuit in Estate of Clarks v. United States, supra, that go beyond the points of Judges Rives and Brown in Cotnam v.

Commissioner, supra:  that the contingent fee arrangement is (1)
like a partnership or joint venture or (2) a division of property
or transfer of a one-third interest in real estate, thereafter
leased to a tenant.

We rejected the first point in Bagley v. Commissioner, 105
T.C. 396, 418-419 (1995), affd. on other issues 121 F.2d 393 (8th
Cir. 1997), in holding that a contingent fee agreement does not
create a partnership or joint venture under section 7701(a)(2)
(see further discussion infra part 10).

The citation by the Court of Appeals for the Sixth Circuit
of Wodehouse v. Commissioner, 177 F.2d 881, 884 (2d Cir. 1949),
raises doubts about the second point.  Wodehouse is just another
case that illustrates the proposition, see Chirelstein, Federal
Income Taxation 203 (8th ed. 1999), that interests in self-
created property rights, such as paintings, patents, and
copyrights, "are effectively assignable for tax purposes despite
the elements of personal services on the part of the assignor."
Id.[42]

> 5.  Significance of Control in Supreme Court's
>       Assignment of Income Jurisprudence

The transfers of income or property at issue in the classic
cases on which the dissent of Judge Wisdom and this Court have
relied--cases such as Lucas v. Earl, supra, and Helvering v.

---

[42] A recent case that illustrates the proposition is Meisner
v. United States, 133 F.3d 654 (8th Cir. 1998).

Horst, supra--were intrafamily donative transfers.[43]  If given
effect for tax purposes, such intrafamily transfers would permit
family members to "split" their incomes and avoid the progressive
rate structure (a less pressing concern these days).  In
addition, because the transferred item never leaves the family
group, the transferor may continue to enjoy the economic benefits
of the item as though the transfer had never occurred.  See
Commissioner v. Sunnen, 333 U.S. 591, 608-610 (1948) (husband
transferred patent licencing contracts to wife; husband's
indirect post-transfer enjoyment of royalty payments and other
benefits received by wife a factor favoring decision that
transfer was an invalid assignment of income); Helvering v.
Clifford, 309 U.S. 331 (1940) (husband created short-term trust
for wife's benefit; intrafamily income-splitting possibilities
required special scrutiny of arrangement, and husband's continued

---

[43] The statement of facts in the third Supreme Court
decision relied on by the majority and the dissent of Judge
Wisdom, Helvering v. Eubank, 311 U.S. 122 (1940), does not reveal
whether the transfer at issue was intrafamily.  However, the
majority opinion in Eubank contains no independent analysis; it
rests entirely on the reasoning of the Supreme Court's opinion in
the intrafamily transfer companion case of Helvering v. Horst,
311 U.S. 112 (1940).  In addition, in Commissioner v. Sunnen, 333
U.S. 591, 602-603 (1948), the Supreme Court described Eubank,
along with several other classic assignment of income cases, as
part of the "Clifford-Horst line of cases", all involving
transfers within the family group.  The Supreme Court in Sunnen
further stated that "It is in the realm of intra-family
assignments and transfers that the Clifford-Horst line of cases
has peculiar applicability."  Commissioner v. Sunnen, 333 U.S. at
605.

indirect enjoyment of wife's benefit a factor in decision to treat husband as owner of trust). Contingent fee agreements between client and attorney do not present these problems.

Equally importantly, in Lucas v. Earl, supra, and Helvering v. Horst, supra, the transferor--in part due to the family relationship--was found to have retained a substantial and significant measure of control after the transfer over the income rights or property transferred. The presence of such continuing control is undoubtedly important in deciding whether a transfer should be treated as an invalid assignment of income. As the Supreme Court stated in Commissioner v. Sunnen, 333 U.S. at 604:

> The crucial question remains whether the assignor retains sufficient power and control over the assigned property or over receipt of the income to make it reasonable to treat him as the recipient of the income for tax purposes. * * *

Or, as the Supreme Court wrote in Corliss v. Bowers, 281 U.S. 376, 378 (1930) (revocable trust created by husband for benefit of wife and children treated as invalid assignment of income):

> taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed * * *. * * * The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not. * * *

I acknowledge, with 3 Bittker & Lokken, Federal Taxation of Income, Estates, and Gifts 75-2 (2d ed. 1991), that efforts to shift income have extended beyond the family to other economic units. Courts have been alert, whatever the motivation of the taxpayers before them, to forestall the tax success of

arrangements that, if successful, would be exploited by others. As a result, legislative and judicial countermeasures "have come to permeate the tax law so completely that they sometimes determine which of several parties to an ordinary business transaction must report a particular receipt or can deduct a liability." Id. However, those observations don't answer the question. They just remind us that the taxpayer's arguments deserve strict scrutiny.

I also acknowledge that the assignor's lack of retained control may be trumped if the subject of the assignment is personal service income.[44] Unlike the trust and property cases, Lucas v. Earl, supra, can be rationalized not so much on the service provider's retained control over whether or not he works,[45] "but on the more basic policy to 'tax salaries to those who earned them'".[46]

My response is that Mr. Kenseth's claim did not generate personal service income. Even though the loss of past earnings

---

[44] 3 Bittker & Lokken, Federal Taxation of Income, Estates, and Gifts 75-7 (2d ed. 1991).

[45] The Court of Appeals in Estate of Clarks v. United States, supra, misstates Lucas v. Earl, 281 U.S. 111 (1930), in saying that in that case, as in Helvering v. Horst, supra, "the income assigned to the assignee was already earned, vested and relatively certain to be paid to the assignor". As a matter of fact, the assignment document in Lucas v. Earl had been executed in 1901, long before the effective date of the 16th Amendment; the taxable years in issue were 1920 and 1921. See Lucas v. Earl, supra at 113.

[46] Bittker & Lokken, supra, at 75-11; see also Chirelstein, Federal Income Taxation 194-195, 214-216 (8th ed. 1999).

as well as future income and benefits were taken into account in computing his settlement recovery, Mr. Kenseth's claim had its origin in the rights inhering in a constitutionally or statutorily protected status (e.g., age, sex, race, disability) rather than a free bargain for services under an ongoing employment relationship or personal service contract.  Such rights are no less alienable than other types of property rights that may be bought and sold and otherwise compromised by payments of money.[47]  Indeed, where a claim based on status, such as an ADEA claim, is the subject of a contingent fee agreement, the amount paid the attorney as a result of his successful prosecution of the claim is much more personal service income of the attorney than personal service income of the claimant, however the claimant's share of the income might be characterized for tax purposes.  Again, quoting Bittker & Lokken, supra at 75-13, in a slightly different context:  "If a metaphor is needed, one could say that the pooled income is the fruit of a single grafted tree, owned jointly by the parties to the agreement."[48]

---

[47] Perhaps, contrary to Maine, Ancient Law 100 (Everyman ed. 1931), more recent developments, which, in "progressive societies has hitherto been a movement from Status to Contract," have shifted back to a greater emphasis on status as a source of personal and property rights.

[48] See discussions infra at 80-81 of the "two keys" simile and at 90-97 of the cropsharing analogy.

6.  <u>Substantial Reduction of Claimant's Control by Contingent Fee Agreement</u>

When Mr. Kenseth executed the contingent fee agreement, he gave up substantial control over the conduct of his age discrimination claim.  He also gave up total control of the portion of the recovery that was ultimately received and retained by Fox & Fox.

The contingent fee agreement provided that Mr. Kenseth could not settle his case without the consent of Fox & Fox.  It further provided that, if Mr. Kenseth had terminated his representation by Fox & Fox, that firm would still have a lien for the contingent fee called for by the agreement, and all costs and disbursements would become due and payable within 10 days.  Moreover, Mr. Kenseth was just one member of the class of claimants represented by Fox & Fox.  All these factors contributed, as a practical matter, to the creation of substantial barriers to Mr. Kenseth's ability to fire Fox & Fox and to hire other attorneys or to try to settle his case himself.

Mr. Kenseth instead relied on the guidance and expertise of Fox & Fox, and Fox & Fox made all strategic and tactical decisions in the management and pursuit of Mr. Kenseth's age discrimination claim.  Fox & Fox negotiated a net recovery (after reduction by the contingent fee) that substantially exceeded the settlement that the EEOC had recommended.

i.  "Contract of Adhesion"

For all these reasons it is clear, when Mr. Kenseth signed the contingent fee agreement, that he gave up substantial control--perhaps all effective control--over the future conduct of his age discrimination claim.  This is not surprising; a contingent fee agreement in all significant respects amounts to a "contract of adhesion",[49] defined by Black's Law Dictionary 318-319 (7th ed. 1999) as:  "A standard-form contract prepared by one party, to be signed by the party in a weaker position, usu. a consumer, who has little choice about the terms".[50]

I'm not suggesting that the contingent fee agreement would be unenforceable;[51] contracts of adhesion are prima facie enforceable as written.  See Rakoff, "Contracts of Adhesion:  An

---

[49] See Rakoff, "Contracts of Adhesion:  An Essay in Reconstruction", 96 Harv. L. Rev. 1174, 1176-1177 (1983), which sets forth seven characteristics that define a "contract of adhesion"; all these characteristics are present in the contingent fee agreement between Mr. Kenseth and Fox & Fox.

[50] The landmark article that coined and gave currency to the appellation "contract of adhesion" is, of course, Kessler, "Contracts of Adhesion--Some Thoughts About Freedom of Contract", 43 Colum. L. Rev. 629 (1943).  The less inflammatory term found and used in Restatement, Contracts Second, sec. 211 (1979), is "standardized agreement".  But see Corbin on Contracts, secs. 559A-559I (Cunningham & Jacobson, Cum. Supp. 1999).

[51] Other than the uncertainty regarding enforceability of the provision in Section III of the agreement that Mr. Kenseth and the other claimants in the class action could not settle their cases without the consent of Fox & Fox.

Essay in Reconstruction", 96 Harv. L. Rev. 1174, 1176 (1983).[52]

Nor do I suggest that the contingent fee agreement in the case at hand operated unfairly so as to make it unenforceable. I do suggest that the character of the agreement as a contract of adhesion supports my ultimate finding that Mr. Kenseth as the adhering party gave up substantial control over his claim, which was the subject matter of the agreement.

ii. <u>American Bar Foundation Contingent Fee Study</u>

My ultimate finding in this case is not just the sympathetic response of a "romantic judge"[53] or an idiosyncratic reaction divorced from the practical realities of the operation of contingent fee agreements. My findings on Mr. Kenseth's reduced control over the prosecution and recovery of his claim are supported by the recurring comments to the same effect in the study by MacKinnon, Contingent Fees for Legal Services: A Study of Professional Economics and Liabilities (American Bar Foundation 1964). What is striking about the MacKinnon study, which makes no mention of any tax questions, are its repeated

---

[52] In a departure from traditional analysis, Rakoff, <u>supra</u> at 1178-1179, asserts that adhesive contracts may exist in otherwise competitive markets. This would appear to be the case with respect to that segment of the market for legal services in which contingent fee agreements are customarily used. There is no reason to believe that much if any bargaining occurs with respect to the other terms of contingent fee agreements concerning the attorney's lien and the contractual provisions for its enforcement. So it appears in the case at hand.

[53] See Glendon, A Nation Under Lawyers 151-173 (1994).

references[54] to the high degree of practical control that attorneys acquire under contingent fee agreements over the prosecution, settlement, and recovery of plaintiffs' claims.

After Mr. Kenseth signed the contingent fee agreement, he had absolutely no control over the portion of the recovery from his claim that was assigned to and received by Fox & Fox as its legal fee. The agreement provided that, even if Mr. Kenseth fired Fox & Fox, Fox & Fox would receive the greater of 40 percent of any recovery on Mr. Kenseth's claim or their regular hourly time charges, plus accrued interest of 1 percent per month, plus a risk enhancer of 100 percent of their regular hourly charges (not exceeding the total recovery). The agreement also stated that Mr. Kenseth gave Fox & Fox a lien on any recovery or settlement. The agreement also provided that Mr. Kenseth would not settle the claim without first obtaining the approval of Fox & Fox.

As noted above, the contingent fee agreement between Mr. Kenseth and Fox & Fox was not an intrafamily donative transaction and did not occur within an economic group of related parties. In addition, Mr. Kenseth's control of his claim (and of any recovery therefrom) was sharply reduced or eliminated by the

---

[54] See MacKinnon, Contingent Fees for Legal Services: A Study of Professional Economics and Liabilities 5, 21-22, 29, 62, 63, 64, 70, 73, 77, 78-79, 80, 196, 197, 211 (American Bar Foundation 1964).

contingent fee agreement. For all these reasons, the broader ground of the decisions of the Courts of Appeals in Cotnam v. Commissioner, 263 F.2d 119 (5th Cir. 1959), and Estate of Clarks v. United States, 202 F.3d 854 (6th Cir. 2000), applies to the case at hand. The contingent fee agreement did not effect an assignment of income that must be disregarded for income tax purposes under Helvering v. Eubank, 311 U.S. 122 (1940), Helvering v. Horst, 311 U.S. 112 (1940), and Lucas v. Earl, 281 U.S. 111 (1930).

This conclusion provides an independent and sufficient ground for the holding, decoupled from the narrow ground of Cotnam and Estate of Clarks regarding attorneys' ownership interests in lawsuits under State law, that Mr. Kenseth's gross income in the case at hand does not include any part of the settlement proceeds paid to the Fox & Fox trust account and retained by Fox & Fox as its contingent fee.

The application of the decisions of the Courts of Appeals in Cotnam and Estate of Clarks is not limited to situations in which local law allows a transfer of a "proprietary" interest in the claim to the attorney. These holdings apply to situations in which the attorney obtains only the usual security interest in the claim and its proceeds that is provided in most States.

It is noteworthy that neither the additional statement of the Cotnam majority nor the dissent of Judge Wisdom referred to

the Alabama law that provides for the transfer of a proprietary interest in the claim to the attorney. The language of the additional statement supports the offset approach in all contingent fee situations in which the proceeds of the settlement or judgment are pursuant to prearrangement paid directly to the attorney (or to attorney and client as joint payees) with the understanding that the attorney will calculate and pay himself the fee and pay the balance to the client. To make the result depend upon whether a technical ownership interest was transferred under State law would make the outcome depend on "attenuated subtleties" and "refinements" that, as Justice Holmes said in Lucas v. Earl, supra at 114, and Judge Raum said in O'Brien v. Commissioner, supra at 712, should be disregarded.[55]

iii. "Two Keys" Simile

The contingent fee situation is much like that in Western Pac. R.R. Corp. v. Western Pac. R.R. Co., 345 U.S. 247, 277 (1953) (Jackson, J. dissenting), which concerned the respective interests of former parent corporation and subsidiary in the tax

---

[55] It also appears, notwithstanding that petitioners did not argue the point in the case at hand, that plaintiffs in a class action, such as Mr. Kenseth, in a legal and practical sense have less control over the prosecution of their claims than a sole plaintiff who has signed a contingent fee agreement. See Newberg on Class Actions, sec. 5.25--Individual Settlements More Difficult after Commencement of Class Action (3d ed. 1992). Compare Eirhart v. Libbey-Owens-Ford Co., 726 F. Supp. 700 (N.D. Ill. 1989), with Sinyard v. Commissioner, T.C. Memo. 1998-364, and Brewer v. Commissioner, T.C. Memo. 1997-542, affd. without published opinion 172 F.3d 875 (9th Cir. 1999).

benefits of net operating losses arising in consolidated return periods:

> Each corporation then had a bargaining position. The stakes were high. Neither could win them alone, although each had an indispensable something that the other was without. It was as if a treasure of seventeen million dollars were offered * * * to whoever might have two keys that would unlock it. Each of these parties had but one key, and how can it be said that the holder of the other key had nothing worth bargaining for?

The tax position of Mr. Kenseth is stronger than that of either claimant in the <u>Western Pac. R.R.</u> case. Justice Jackson's reference to the "treasure" is to a static, fixed, pre-determined amount, the tax benefit from the net operating losses. When attorney and client enter a contingent fee agreement, the amount of the ultimate recovery is unknown; the recovery is determined in a dynamic process in which the exercise of the experience and skill of the attorney results both in some recovery and in an increase in the value of that recovery. The attorney creates and adds value; the efforts of the attorney contribute to--indeed he may be solely responsible for--both the recovery and its augmentation. Attenuated subtleties and refinements of title have nothing to do with the practical realities of contingent fee agreements and the relative interests of attorney and client in any recovery that may ultimately be realized.

7. Omissions and Distortions:  the Majority Opinion

The majority opinion makes a caricature of the findings it purports to adopt by ignoring some and distorting others.[56] Some examples:

First, on the meaning and application of the term "control": neither "control" nor "lack of control" is a monolithic concept, nor do they occupy opposite sides of the same coin.  Many elements or strands are braided into the ownership and control of a claim or cause of action.  The question is whether enough elements of control over all or part of the claim are given up by the client who enters into a contingent fee agreement to make it inappropriate to include the entire amount of the recovery in the client's gross income.  The correct answer is to allocate the recovery in the first instance between attorney and client as their interests may appear in accordance with the terms of the contingent fee agreement.

Petitioner gave up substantial control over his claim, and all control over the portion attributable to the contingent fee. Even if Smelker v. Chicago & N.W. Ry., 81 N.W. 994, 994 (Wis. 1900) is no longer good law under the Wisconsin attorney's lien law and the Wisconsin ethical rules require an attorney to abide by a client's decision to accept an offer of settlement, the

---

[56] In so doing, the majority opinion creates a mismatch between findings of fact and opinion that is reminiscent of the centaur in Greek mythology.

contrary provision in the contingent fee agreement substantially dilutes the control retained by the client, as shown by Tonn v. Reuter, 95 N.W.2d 261 (Wis. 1959), and Goldman v. Home Mut. Ins. Co., 126 N.W.2d 1 (Wis. 1964). Even if that provision of the fee agreement should not be enforced in strict accordance with its terms if it came to a lawsuit between the client and the first attorney, that provision of the agreement creates considerable uncertainty. That uncertainty means the client has far less retained control over the prosecution of the claim than the assignor of an interest in the income from his own future services to third parties. Further, the client's ability to fire the attorney and hire another is severely limited by the likelihood that liability for two sets of fees will result. So much for the practical substance of the "ultimate control" retained by the client who signs a contingent fee agreement.

The majority opinion distorts the taxpayer's position by stating, p. 26: "There is no evidence supporting petitioner's contention that he had no control over his claim." First, there is substantial evidence that petitioner suffered a substantial reduction in his control over his claim; it's right there in the findings. Second, petitioners aren't arguing that they had no control; they're just saying that their control was substantially reduced. We're not called upon to come up with relative percentages of control; that would be a sterile exercise in

trying to create an unnecessary appearance of certainty. The substantial impediments petitioners subjected themselves to in entering into the contingent fee agreement are enough to take this case out of the traditional assignment of income situation, where the assignor's retained control is absolute and unfettered.

On page 27, the majority opinion uses the gross misnomer "details" to characterize what Mr. Kenseth entrusted to Fox & Fox. How can it be accurate to say that Fox & Fox was only responsible for the "details of his [Mr. Kenseth's] litigation"? Mr. Kenseth and the other class members were able with the advice of Fox & Fox to sign the severance agreement and receive severance pay, as well as press their ADEA claims; this is because APV and its attorneys had made a mistake in preparing the severance agreement that was spotted by Fox & Fox. The findings also note that EEOC had recommended that the claims be settled for an amount 2.5 times smaller than what Fox & Fox was able to negotiate. To quote from the findings:

> Petitioner and the other members of the class relied on the guidance and expertise of Fox & Fox in signing the separation agreements tendered to them by APV and then seeking redress against APV. Commencing with the advice to petitioner that he could sign the separation agreement with APV without giving up his age discrimination claim, Fox & Fox made all strategic and tactical decisions in the management and pursuit of the age discrimination claims of petitioner and the other class members against APV that led to the settlement agreement and the recovery from APV. [Majority op. p. 12.]

Further, Fox & Fox factored into the settlement an amount for their fee that was grossed up in the total, so that the total net recovery was still $1.9 million, almost twice EEOC's original valuation of the claim.

All this supports my conclusions that Fox & Fox added substantial value to the raw claim as it existed immediately prior to execution of the contingent fee agreement(s) and that Fox & Fox was responsible for much more than mere "details".

At page 25, the majority opinion says: "The entire ADEA award was 'earned' by and owed to petitioner, and his attorney merely provided a service and assisted in realizing the value already inherent in the cause of action."  Is the majority opinion saying that, at the time immediately prior to petitioner's entry into the contingent fee agreement, the claim had the same value as the amount ultimately recovered?  Of course not; the uncertain speculative front end value had to be discounted to reflect the time value of money and the risks of litigation.  Fox & Fox added substantial value to the claims of Mr. Kenseth and his colleagues.  Under the terms of the contingent fee agreement, Fox & Fox's shares of the recovery should be taxed to them directly and not run through petitioner and the other members of the class who never even had the chance to kiss goodbye what they never became entitled to receive.

8.  Majority Opinion's Handling of Authorities

The majority misstate the Alexander, Baylin, Brewer, and O'Brien cases (majority op. pp. 14, 17-18, and 21, respectively) and what they stand for.

The majority opinion at page 14 creates a misleading impression about the significance of Alexander v. IRS, 72 F.3d 938, 948 (1st Cir. 1995), affg. T.C. Memo. 1995-51.  The Court of Appeals for the First Circuit did affirm the Tax Court, and the Court of Appeals did say that applying the AMT to the itemized deductions "smacks of injustice", as indeed it did--the sum of the legal fees and the additional tax liability exceeded the taxpayers' net taxable recovery.  What the majority opinion omits is that the taxpayer in Alexander did not argue, as petitioners argue in the case at hand, that the legal fee should be excluded from petitioner's gross income because the assignment of income rules don't properly apply.[57]  There was both a taxable recovery-- $250,000--and a concededly non-taxable recovery--$100,000--and the taxpayer deducted an allocable part of his legal fees (computed on a disproportionate time basis, which the Commissioner did not dispute) from the taxable recovery.  The Tax Court and the Court of Appeals for the First Circuit held,

_____

[57] Alexander v. IRS, 72 F.3d 938, 948 (1st Cir. 1995), affg. T.C. Memo. 1995-51, lacked any findings as to whether the legal fee in question was a contingent fee or a fee based on hourly rates for which the taxpayer was personally liable.

because the recoveries related to taxpayer's wrongful termination as an employee, that the fees so deducted by the taxpayer were employee business expenses properly treated as itemized deductions subject to the 2-percent floor and the AMT. In so doing, the courts rejected the taxpayer's argument that the deductible legal fees were Schedule C expenses because, notwithstanding his wrongful termination as an employee, he had thereafter gone into the management consulting business as an independent contractor. The settlement proceeds were compensation ordinary income and did not represent amounts received on the disposition of intangible assets. Consequently, the legal fees were not incurred in a disposition and could not be netted against the settlement proceeds received.[58]

---

[58] Respondent argues in the alternative in the case at hand that if Mr. Kenseth was able to assign an interest in his cause of action to Fox & Fox, that assignment was itself a taxable transaction. Mr. Kenseth entered into the contingent fee agreement in 1991; that year is not before us. Therefore, we are not required to consider the tax consequences, if any, of the signing of the contingent fee agreement. See Schulze v. Commissioner, T.C. Memo. 1983-263 (assignment of claim in 1975 by husband to wife in connection with divorce shifted burden of taxation on amounts recovered on that claim in 1976; we found it unnecessary to consider the Commissioner's alternative argument that the assignment was a taxable event in the earlier year, because that year was not before us).

The Justice Department in its brief on appeal to the Court of Appeals for the Eleventh Circuit in Davis v. Commissioner, T.C. Memo. 1998-248, affd. per curiam ___ F.3d ___ (11th Cir. 2000) (see supra note 36), also made the alternative argument-- not raised by the Commissioner in the Tax Court--that the contingent fee agreement is a transfer of an interest in the fee
(continued...)

With respect to Baylin, the majority opinion says: "The Court of Appeals for the Federal Circuit sought to prohibit taxpayers in contingency fee cases from avoiding Federal income tax with 'skillfully devised' fee agreements." Majority op. p. 18. This language from Lucas v. Earl, which had to do with protecting the progressive rate structure, obviously has no bearing on latter-day contingent fee arrangements. I also disagree with Baylin's in effect applying Old Colony Trust Co. to treat the fee, which becomes the lawyer's share of the realized claim, as an amount realized by the client that is properly included in the sum of satisfactions procured by the client. Even though the lawyer may not obtain legal ownership of the claim, there is no denying that the lawyer acquires a substantial economic interest in the ultimate recovery.

The majority opinion cites Brewer v. Commissioner, 172 F.3d 875 (9th Cir. 1999), affg. without published opinion T.C. Memo. 1997-542, as if it were substantial authority. Both the unpublished opinion of the Court of Appeals and this Court's

---

[58](...continued)
with a zero basis on which the taxpayer realized deferred income or gain in the year of the recovery under the open transaction theory. This argument really is nothing more than a restatement of the anti-assignment of income argument that begs the question. The question unanswered by the Justice Department and the Commissioner is whether the taxpayer is entitled to treat the contingent fee as a cost of obtaining the total recovery or an offset that must be taken into account in computing gross income, rather than including the entire recovery in gross income and taking a separate deduction for the fee.

memorandum opinion--the taxpayer was pro se--provide no more than a lick and a promise on this point. The taxpayer in <u>Brewer</u> was a member of a class of hundreds (women who had been discriminated against in the recruiting, hiring, and training of sales agents by the State Farm insurance companies). I find it incredible that those claimants were all required to gross up their recoveries and then deduct their respective shares of the legal fees. I doubt that any member of such a large class had a scintilla of control over the conduct of the class action.

The majority opinion's quotations from <u>O'Brien v. Commissioner</u>, 38 T.C. at 710, particularly, "Although there may be considerable equity to the taxpayer's position, that is not the way the statute is written" (majority op. p. 21), ignore that <u>O'Brien</u> and its antecedents and descendants were construing statutory spreadback provisions, not applying the assignment of income doctrine under section 22 of the 1939 Code, section 61 of the 1954 or 1986 Code, or the 16th Amendment.

9. <u>Preventing Tax Avoidance by Other Transferors</u>

The majority state at page 14: "We perceive dangers in the ad hoc modification of established tax law principles or doctrines to counteract hardship in specific cases, and, accordingly, we have not acquiesced in such approaches". Although the majority opinion does not spell out those dangers, concerns have been expressed that adoption of my findings and

conclusion would open the door to tax avoidance.  My response to such concerns is that the contingent fee agreement is a peculiar situation, far removed from the intrafamily and other related party transfers, including commercial assignments within economic units, that generated and continue to sustain the assignment of income doctrine.  The result I espouse can be confined to the contingent fee situation; the tools of legal reasoning remain alive and well to enable the Commissioner and the courts to defend the fisc against transferors who in other contexts might seize upon my proposed result in this case to try to extend it beyond its proper limits.

10.  Cropsharing as Alternative to Joint
     Venture/Partnership Analogy

The suggestion of the Court of Appeals in Estate of Clarks v. United States, supra, that the contingent fee arrangement is like a partnership or joint venture has intuitive appeal. Posner, Economic Analysis of Law 624-626 (5th ed. 1998), describes the contingent fee agreement not only as a high interest rate loan that compensates the lawyer for the risk he assumes of not being paid at all if the claim is unsuccessful and for the postponement in payment,[59] but also as a kind of joint

---

[59] See also Garlock, Federal Income Taxation of Debt Instruments 6-10 (1998 Supp.):  "Thus, rights to wholly contingent payments would be treated in accordance with their economic substance".  Garlock also comments p. 6-33:

(continued...)

ownership "(and a contingent fee contract makes the lawyer in effect a cotenant of the property represented by the plaintiff's claim)", id. at 625, which could also lead to partnership/joint venture characterization.

Adoption of the partnership/joint venture analogy could create problems that would require attention. It has been suggested that partnership or joint venture characterization would open the door to tax avoidance by attorneys who enter into contingent fee agreements.[60] Examples include the possibility that attorneys would contend that partnership characterization entitles them to distributive shares of the tax-free recoveries in personal injury actions and to current deductions for the

---

[59](...continued)
Because many contracts for the sale of property that call for contingent payments involve principal payments that are wholly contingent, it is doubtful that these contracts would be viewed as debt instruments and accordingly would be subject to section 483 rather than section 1274. * * *

It seems likely that a contingent fee contract would be treated under a debt analysis as contingent as to both principal and interest; both the principal and interest amounts could be determined only when and if the claim is satisfied so as to give rise to the lawyer's entitlement to a fee, see Garlock supra at 4-21 and 22, and would not satisfy the form or substance requirements of debt. As a result, there is obvious similarity in substance if not in form to a partnership or joint venture between attorney and client.

[60] Kalinka, "A.L. Clarks' Est. and the Taxation of Contingent Fees Paid to an Attorney", 78 Taxes 16, 18-20 (Apr. 2000).

advances of costs they make to their clients.[61]  In addition,

local law and ethical rules prohibiting the assignment of claims

to attorneys would be obstacles to the making of the capital

contribution that is the prerequisite to the formation of a

partnership.[62]  See <u>Luna v. Commissioner</u>, 42 T.C. 1067 (1964), and

<u>Estate of Smith v. Commissioner</u>, 313 F.2d 724 (8th Cir. 1963),

affg. in part, revg. in part, and remanding 33 T.C. 465 (1959),

which rejected arguments by service providers that they had

entered into partnership agreements that entitled them to capital

gain treatment of what was held to be compensation income.[63]

     Although I agree with our rejection in <u>Bagley v.</u>

<u>Commissioner</u>, 105 T.C. 396 (1995), of the partnership/joint

venture analogy, we did not go far enough in exploring the

consequences of other arrangements that don't amount to

partnerships or joint ventures and yet result in the division of

---

[61] See, e.g., <u>Canelo v. Commissioner</u>, 53 T.C. 217 (1969), affd. 447 F.2d 484 (9th Cir. 1971).

[62] Although secs. 1.721-1(a) and 1.707-1(a), Income Tax Regs., contemplate arrangements in which a partner makes property available for use by the partnership without contributing it to the partnership, such arrangements are considered to be transactions between the partnership and a partner who is not acting in his capacity as a partner.  If this were the only transaction between the putative capital partner and the putative partnership, it would appear that no contribution of property to the partnership would have occurred.

[63] Other examples of unsuccessful efforts by assignment to transmute ordinary income into capital gain may be found in <u>Commissioner v. P.G. Lake, Inc.</u>, 356 U.S. 260 (1958), and <u>Hort v. Commissioner</u>, 313 U.S. 28 (1941).

the proceeds or income from an activity. Although section 301.7701-1(a)(2), Proced. & Admin. Regs., provides that certain joint undertakings may give rise to entities for federal tax purposes "if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom," the examples that follow illustrating such arrangements, also distinguish them from mere joint undertakings to share expenses or arrangements by sole owners or tenants in common to rent or lease property, such as cropsharing arrangements.

One way to think of the contingent fee agreement, which brings us back to the metaphor about fruits and trees, is to analogize it to a cropsharing arrangement.[64] Cropsharing is strikingly similar to the contingent fee agreement. The attorney is in the position of the tenant farmer, who bears all his direct and overhead expenses incurred in earning the contingent fee (and

---

[64] To adopt another agricultural metaphor, a claim, lawsuit, or cause of action is, see Compact Oxford English Dictionary 1838 (1971), a "monocarp", "a plant that bears fruit but once * * *. Annuals and biennials, which flower the first or second year and die, as well as the Agave, and some palms which flower only once in 40 or 50 years and perish, are monocarpic. * * * The plant itself is also completely exhausted, all its disposable formative substances are given up to the seed and the fruit, and it dies off (monocarpous plants)". So the unsuccessful lawsuit dies off without bearing fruit, but, with the successful husbandry of an attorney who has entered into a contingent fee agreement with the client, the lawsuit may come to fruition in a recovery, which is shared by the client and attorney under the terms of the agreement.

the contingent fees under all such arrangements to which he is a party with other clients).  The client is in the position of the landowner (lessee-sublessor), who bears none of the operating expenses, but is responsible for paying the carrying charges on his land, such as mortgage interest and real estate taxes.  These charges are analogous to court costs, which the client under a contingent fee agreement is usually responsible for, and which the attorney can only advance to or on behalf of the client.

It is apparently so clear that there is no direct authority that cropsharing arrangements result in a division of the crops and the total gross revenue from their sale in the agreed upon percentages.  See IRS Publication 225, Farmer's Tax Guide 15-16 (1999).  This income is characterized as rental income to the owner or lessee of the land and farm income to the tenant-farmer. See id.[65]

The analogy of contingent fee agreements to crop sharing arrangements is suggestive and helpful.  It solves the problem under the attorney's ethics rule that says the attorney is not

---

[65] Probably the most litigated issue has been whether, under the facts of each particular case, there has been "material participation" by the owner or lessee so as to obligate him or her to pay self-employment tax and to be entitled to Social Security benefits.  See, e.g., Davenport, Farm Income Tax Manual sec. 303, "Rents Received in Crop Shares", particularly "Material Participation Trade-off", pages 203-204 (1998 ed.); ALI-ABA, Halstead, ed., Federal Income Taxation of Agriculture, ch. 2 Social Security and the Farmer, particularly 16-27 (3d ed. 1979).

supposed to acquire an ownership interest in the cause of action that is the subject of such an agreement.  The client, like the owner or lessee of farmland who rents it to the tenant farmer, transfers to the attorney an interest in the recovery that is analogous to the tenant farmer's share of the crop generated by his farming activities on the land leased or made available to him by the non-active owner or sublessor.

1 McKee et al., Federal Taxation of Partnerships and Partners, par. 3.02[5], at 3-15-16 (3d ed. 1997), cites Smith v. Commissioner, supra, and Luna v. Commissioner, supra, among others, for the following propositions:

> A profit-oriented business arrangement is not a partnership unless two or more of the participants have an interest in the partnership as proprietors.  Thus an agreement to share profits is not a partnership if only one party has a proprietary interest in the profit-producing activity.  For example, the owner of a business may agree to compensate a hired manager with a percentage of the income of the business, or a broker may be retained to sell property for a commission based on the net or gross sales price.  Even though both arrangements culminate in the division of profits, neither constitutes a partnership unless the arrangement results in the parties becoming coproprietors.

> The Culbertson intent test has its greatest continuing viability in connection with the elusive distinction between coproprietorship arrangements and other arrangements for the division of profits.  A number of objective factors may be taken into account in determining whether participants intend to operate as coproprietors or to share profits as third parties dealing at arm's length.

McKee et al. go on to discuss the characteristics of proprietary profits interests, and other factors evidencing proprietary interests, such as agreement to share losses, ownership of a capital interest, participation in management, performance of substantial services, and the intention to be a partnership, which includes not only the intention to share profits as coproprietors, but can also be evidenced by more mundane factors, such as entry into a partnership agreement and the filing of partnership returns. See Commissioner v. Culbertson, 337 U.S. 733 (1949); Luna v. Commissioner, supra at 1077-1078; Estate of Smith v. Commissioner, supra.

McKee et al. at par. 5.03[2] n.120 again cite Estate of Smith and other cases for the proposition that, if a service provider obtains only an interest in future profits, the courts have been reluctant to recognize the service provider as a partner; instead they treat him as an employee or independent contractor who has received nothing more than a promise of contingent compensation in the future. Given the nature of the attorney-client relationship, independent contractor is the relationship that obtains under the contingent fee agreement. Under this arrangement, as in Estate of Smith v. Commissioner, supra, the profits are divided between the parties in the agreed upon percentages. But the decision not to treat the arrangement as a partnership assures that the income of the service provider

retains its character as compensation ordinary income. The service provider's income does not take its character from the property that belongs to the other party who made it available to be worked on by the service provider.

## Conclusion

The assignment of income cases decided by the Supreme Court for the most part have arisen in intrafamily donative transfers. Assignment of income cases arising in commercial contexts have concerned attempts at income tax avoidance between related parties. The touchstone of these cases has been the retained control over the subject matter of the assignment by the assignor.

The control retained by Mr. Kenseth in this case was much less than the control retained by the assignor in any of the cases in which the assignment of income doctrine has been properly applied. Indeed, the control retained by Mr. Kenseth was so much less as to make it unreasonable to charge him with the full amount of his share of the total settlement, without offset of the attorney's fee apportioned against his share. From the inception of the contingent fee agreement, a substantial portion of any recovery that might be obtained was dedicated to Fox & Fox, who through the mixture of their labor with the claims of Mr. Kenseth and his colleagues, first, caused the claims to be

realized under a settlement agreement, and, second, added substantially to whatever speculative value those claims might have had when the contingent fee agreements were entered into.

The Bankruptcy Court for the Middle District of Alabama said it very well in recently applying Cotnam in Hamilton v. United States, 212 Bankr. 212 (Bankr. M.D. Ala. 1997), a case that would have been appealable to the Court of Appeals for the Eleventh Circuit: "This decision does not limit taxation of the total amount of the judgment as income. It merely apportions the income to the proper entities".

In conclusion, there should be no concern that giving effect to my findings and conclusion will open the door to tax avoidance. They are confined to a peculiar situation, far removed from the intrafamily and other related party transfers that generated and sustain the assignment of income doctrine. The case at hand is not an appropriate occasion for application of that doctrine. The gross income realized and received by Mr. Kenseth and his colleagues should not be inflated to include the contingent fee paid to their attorneys.